**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Civil Action No. ________________

WILLIAM FOSTER, on behalf of himself and all others similarly situated,

Plaintiff,

v.

SIG SAUER INC.,
SMITH & WESSON BRANDS, INC.,
STURM, RUGER & COMPANY, INC.,
GLOCK, INC.,
FN AMERICA, LLC,
BERETTA U.S.A. CORP.,
BPS DIRECT, LLC,
CABELA'S LLC, and
DOES 1-20,

Defendants.

---

**CLASS ACTION COMPLAINT**

---

TABLE OF CONTENTS

I. NATURE OF THE ACTION ........................................................................................ 1

II. JURISDICTION AND VENUE ........................................................................................ 8

III. PARTIES ........................................................................................ 9

A. Plaintiff ........................................................................................ 9

B. Defendants ........................................................................................ 10

IV. FACTUAL ALLEGATIONS ........................................................................................ 17

A. Retail Firearms ........................................................................................ 17

1. Handguns ........................................................................................ 17

2. Rifles ........................................................................................ 21

3. Shotguns ........................................................................................ 21

B. United States Firearm Sales and Distribution ........................................................ 22

C. The Firearms Industry Collectively Cultivated and Reinforced Price-Insensitive Demand for Retail Firearms with the Assistance of Trade Associations, Influencers, and Others ........ 27

D. Anticompetitive Conduct ........................................................................................ 32

1. MAP and Related Minimum-Price Policies Restrict Price Competition Throughout the Firearm Distribution Chain ........................................................ 32

2. Retailers and Wholesalers Pressed Manufacturers to Agree to Restrain Online Price Competition ........................................................ 36

3. 2015 NASGW Webinar and Sig Sauer's MAP Policy ........................................ 39

4. BPS Obtained Commitments from the Manufacturer Defendants to Implement and Enforce Anticompetitive Pricing Policies ........................................ 41

5. Other Retailers Pressed Manufacturers to Enforce MAP ........................................ 44

6. The Manufacturer Defendants Enforced Analogous Minimum-Price Programs ......... 45

7. Defendants Used Similar Methods to Detect Violations of Their Pricing Policies ...... 60

8. Plus Factors in the Firearms Industry Provide Additional Evidence of a Conspiracy.. 63

E. Defendants' Conspiracy Resulted in Artificially Inflated Prices for Retail Firearms ...... 80

V. STATUTE OF LIMITATIONS ........................................................................................ 81

VI. CLASS ALLEGATIONS ........................................................................................ 83

VII. CAUSES OF ACTION ........................................................................................ 86

REQUEST FOR RELIEF ........................................................................................ 91

Plaintiff William Foster ("Plaintiff"), on behalf of himself and all others similarly situated, upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against Defendants Sig Sauer Inc. ("Sig Sauer"), Smith & Wesson Brands, Inc. ("S&W"), Sturm, Ruger & Company, Inc. ("Ruger"), Glock, Inc. ("Glock"), FN America, LLC ("FN"), Beretta U.S.A. Corp. ("Beretta"), BPS Direct, LLC d/b/a Bass Pro Shops ("BPS"), Cabela's LLC ("Cabela's"), and Does 1-20 (all defendants referred to together as "Defendants") for violations of federal and state antitrust and consumer protection laws.

## I. NATURE OF THE ACTION

1. This action challenges a *per se* unlawful price fixing conspiracy in the United States market for firearms (specifically, pistols, revolvers, rifles, and shotguns) sold at retail ("Retail Firearms"). Beginning on or around January 1, 2015, and continuing through the present (the "Class Period"), competing firearm manufacturers, working together with major retailers, collectively agreed to adopt, maintain, and vigorously enforce minimum advertised price ("MAP") and functionally equivalent minimum-price policies. These restrictions prevented retailers and distributors from competing freely on price and kept the prices of Retail Firearms artificially inflated. And through the feedback loop jointly created by the conspirators and other members of the firearms industry—in which they pushed messages of fear and endangered cultural identity to American consumers as reasons to buy weapons—the conspirators were able to maintain high consumer demand and entrench higher prices for Retail Firearms.

2. Defendants Sig Sauer, S&W, Ruger, Glock, FN, and Beretta (together, the "Manufacturer Defendants") are six of the largest manufacturers of Retail Firearms in the United States. Collectively, they account for a substantial share of Retail Firearms sold nationwide, including roughly two-thirds of domestically manufactured pistols. Defendants BPS and

Cabela's are two of the country's largest firearm retailers. BPS acquired Cabela's in 2017, and the companies have since operated under common ownership and control while continuing to use both retail brands. They are referred to together as "BPS/Cabela's."

3. During the Class Period, approximately 200 million firearms were sold in the United States, generating billions of dollars in revenues. Those firearms moved through a national distribution system in which manufacturers sold to wholesale distributors, directly to large retailers, or through a combination of both channels. Consumers ultimately purchased Retail Firearms from brick-and-mortar stores, online retailers, and other federally licensed sellers. Firearm retailers are commonly referred to as "dealers."

4. In the early 2010s, the firearms industry entered a new era. The explosion of internet-based firearm sales intensified retail price competition in a manner and on a scale not seen before, even in prior sales booms. Online retailers could advertise nationally and operate with lower overhead than brick-and-mortar stores with large showrooms, inventories, and sales staffs. Consumers could inspect a firearm at a local store, locate a lower price online, and have the firearm shipped to a local federal firearms licensee for the required transfer. Brick-and-mortar retailers increasingly viewed those transactions as sales taken from their stores.

5. Rather than respond only by lowering their own prices or improving their services, influential retailers and wholesale distributors began to pressure firearm manufacturers to restrain online discounting. Retailers demanded strong minimum pricing policies, such as MAPs, and threatened to withdraw shelf space from manufacturers that failed to adopt or sufficiently enforce them. Some Manufacturer Defendants had maintained MAPs or other minimum-price policies before the Class Period, although they proved difficult to maintain during periods of high discounting. But the message to manufacturers was clear: retailers would

favor suppliers that protected retail margins at the expense of customers and would punish manufacturers that allowed online sellers and other discounters to compete aggressively on price.

6. For a manufacturer to unilaterally and inflexibly impose a MAP on its retailers in a competitive market was risky; its firearms could be overpriced compared to those made by manufacturers without such price restrictions. But once retailer and distributor pressure on manufacturers to prop up retail prices began to build in the early to mid-2010s—and the Manufacturer Defendants began speaking directly to one another about such pricing—their policies began to converge.

7. By 2015, the Manufacturer Defendants understood that sporadic, written policies alone could not sustain minimum retail prices; they needed a common commitment to discipline retail pricing. That year, the National Association of Sporting Goods Wholesalers ("NASGW")—a trade association whose members include firearm manufacturers, distributors, and other participants in the firearm distribution chain, including each of the Manufacturer Defendants—presented a webinar to an audience composed primarily of firearm manufacturers. During that webinar, Sig Sauer explained how both retailer pressure and conversations with its competitor firms had led it to adopt and enforce a formal MAP policy. Sig Sauer described its discussions with retailers and other firearm manufacturers that already enforced so-called "hard" MAP policies, and following those conversations, Sig Sauer decided that the "best thing to respond to frustration in the field" was to have a formal MAP policy. Sig Sauer described its use of automated technology to identify violations, its reliance on retailers to report competitors, and its decision to give the policy "teeth" (*i.e.*, it would strongly enforce the policy). The presentation supplied competing manufacturers with a common blueprint and signaled that the industry was moving toward vigorous, collective enforcement.

8. The Manufacturer Defendants thereafter created or maintained analogous pricing programs directed toward the same objective: preventing unauthorized discounting and protecting margins throughout the distribution chain. Their policies restricted the methods that retailers and distributors could use to offer lower prices, enlisted sales personnel and other industry participants to report violations, and imposed supply-related sanctions on noncompliant sellers. The conspiracy did not require every manufacturer to use the same name, price schedule, monitoring tool, or sanction ladder, although many did so. The shared agreement was that each manufacturer would implement or maintain a minimum price program and enforce it vigorously, with the understanding that its competitors would do the same.

9. While MAP policies nominally regulate advertised prices rather than final transaction prices, in practice, the MAP policies collusively adopted by the Manufacturer Defendants had a broader application and constrained the real prices paid for firearms. The Manufacturer Defendants defined “advertised” broadly to include advertising on websites, online marketplaces, social media, emails, coupons, bundles, promotional codes, shopping-cart displays, and other methods by which a retailer might communicate a lower price. Violations exposed retailers and distributors to warnings, shipment suspensions, do-not-sell designations, and termination of access to the manufacturer’s products. Because consumers often could not learn that a lower price was available, and retailers risked losing their supply if they offered one, MAP commonly became the price consumers actually paid.

10. In or around September 2017, after some but not all Manufacturer Defendants had committed to the conspiracy, BPS reinforced this shared understanding through a supplier meeting at its headquarters in Springfield, Missouri, followed by separate manufacturer-specific discussions. BPS completed its approximately $5 billion acquisition of Cabela’s in September

2017, bringing two of the nation's largest outdoor retailers under common ownership and substantially increasing BPS/Cabela's nationwide footprint and influence over the industry. The supplier meeting brought together approximately 150 to 200 senior executives from firearm manufacturers and other suppliers, including representatives of each Manufacturer Defendant or its affiliated companies.

11. At the supplier meeting, BPS emphasized its size, nationwide reach, and importance to the manufacturers' businesses. Over approximately the following year, BPS met or spoke separately with each Manufacturer Defendant about a set of requirements, including the implementation or enforcement of MAP and other pricing policies, the margins that BPS expected, and the payment of markdown money. (As explained below, "markdown money" refers to manufacturer-provided cash or free goods that offset reduced margins during promotional discounts). BPS made clear that manufacturers that failed to satisfy its requirements risked losing valuable shelf space and promotional opportunities.

12. Representatives of competing manufacturers, including all the Manufacturer Defendants, also discussed BPS's demands with one another in various informal settings. They asked one another whether they intended to follow through on those demands. Although some manufacturers complained about BPS's requirements, they assured one another that they would comply. Those communications confirmed that BPS was seeking comparable commitments from competing manufacturers and seeking to reduce the risk that a manufacturer enforcing minimum prices would lose sales to a competing brand that continued to permit discounting.

13. Defendants also used overlapping mechanisms to police the arrangement. BPS/Cabela's monitored advertised prices at competing retailers and reported suspected violations to the relevant manufacturer, often by forwarding a screenshot of the offending

advertisement. The Manufacturer Defendants used automated internet crawlers, third-party monitoring services, and reports from sales personnel, distributors, and retailers to detect violations and trace products to their source. Manufacturers, including the Manufacturer Defendants, then demanded correction of the advertised price and threatened or imposed warnings, supply restrictions, suspensions, or termination when the retailer or distributor failed to comply.

14. When demand slowed and retailers would normally feel increased competitive pressure to spur sales by means of discounting, Defendants used planned MAP holidays and manufacturer-funded markdown money to provide retailers with a safety valve and otherwise preserve the collusive arrangement. During MAP holidays, Manufacturer Defendants temporarily permitted authorized discounts so retailers could clear inventory. BPS/Cabela's demanded cash payments or free goods from manufacturers to compensate it for the margins lost during those promotions. After the holiday ended, price restrictions resumed. These practices allowed BPS/Cabela's to discount without absorbing the full cost and made the broader pricing arrangement durable through fluctuations in firearm demand.

15. Apart from the allegations of direct inter-competitor communications described above, the alleged price fixing conspiracy can be inferred from Defendants' parallel conduct and the surrounding antitrust plus factors. During the Class Period, the Manufacturer Defendants adopted, maintained, or strengthened analogous MAP and functionally equivalent minimum-price policies; restricted many of the same discounting methods, including coupons, bundles, shopping-cart pricing, and unauthorized promotions; and vigorously enforced their policies through similar monitoring methods and supply-related sanctions. At the same time these parallel

restraints were adopted, maintained, or strengthened, prices for Retail Firearms increased broadly during the Class Period and remain elevated today.

16. Additionally, the alleged agreement is supported by several antitrust plus factors. The Manufacturer Defendants faced common retailer demands, received a common enforcement blueprint, attended the same BPS supplier meeting, subsequently received comparable BPS requirements through separate discussions, and exchanged assurances that they would comply. They also used overlapping monitoring and enforcement systems, shared competitively sensitive information, and had repeated opportunities to communicate through various industry forums. The agreement operated in a concentrated industry with substantial barriers to expansion and relatively price-insensitive consumer demand. The agreement also operated in an industry with a demonstrated history of extraordinary group allegiance, enforced through severe consequences. On two occasions—the 2000 mass ostracization and boycott of S&W when it agreed to voluntarily accept certain gun restrictions in the wake of the Columbine school shooting, and the 2018 ejection of Dick's Sporting Goods from the National Shooting Sports Foundation ("NSSF") for daring to suggest changes in the sales of certain guns in the wake of the Parkland school shooting—Defendants showed that they are ready, willing, and able to enforce industry rules, even ones only whispered about. Together, these allegations plausibly establish that Defendants agreed to suppress retail price competition rather than acting independently.

17. Another plus factor is found within a unique feature of today's American firearms market: its members' concerted effort to insulate firearm sales from cyclical periods of lower demand and price sensitivity by means of widespread social engineering. In earlier decades, the firearms industry had learned that sales booms and busts largely followed politics: when there was a Democrat in the White House, terrorist attacks or foreign wars, or a high-profile gun-

related tragedy, Americans generally bought more guns; otherwise, they generally bought fewer guns. This began to change in the mid-to-late 2010s with the increasing influence of social media, and changed even more dramatically as of 2020, as the COVID-19 pandemic raged and the media highlighted social protests and counter-protests. In this environment, the industry learned that supporting messages of non-specific fears of personal danger and antagonism against "Others" and a need to defend "traditional" values made the firearms industry less vulnerable to sales slumps and less sensitive to price. The result was a consumer base prompted to buy firearms not purely out of desire for the product itself, but as a reaction to the industry's scare tactics. The increasing pace of firearm sales in the 2010s and 2020s broke previous patterns and showed that Defendants and others in the industry could maintain strong firearm demand, no matter how inflated the prices became as a result of the MAP conspiracy.

18. The lack of competition among Defendants has been to the detriment of Plaintiff and members of the Class (defined below) and has caused them to pay supracompetitive prices for Retail Firearms purchased from Defendants during the Class Period. Plaintiff brings this class action Complaint against Defendants for violations of federal and state antitrust and consumer protection laws and common law and seeks to recover damages for the overpayment of Retail Firearms, as well as other relief.

## II. JURISDICTION AND VENUE

19. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Additionally, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members in

the proposed Class; and at least one member of the proposed Class is a citizen of a state different from Defendants.

20. **Supplemental Jurisdiction**. In addition to violations of the federal antitrust laws, Plaintiff also alleges violations of state law. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore, should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

21. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District.

22. **Venue.** Venue in this District is proper as Defendant Sig Sauer is headquartered in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District.

23. **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

## III. PARTIES

### A. Plaintiff

24. Plaintiff William Foster is an individual and an Alabama resident. During the Class Period, Foster purchased from Defendant BPS one or more Retail Firearms produced by Manufacturer Defendants. As a result of Defendants' anticompetitive conduct, Foster paid higher prices for one or more Retail Firearms.

**B. Defendants**

25. ***Sig Sauer.*** Sig Sauer Inc. is a Delaware corporation with its principal place of business located in Newington, New Hampshire.

26. During the Class Period, Sig Sauer manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

27. Sig Sauer is one of the largest manufacturers of Retail Firearms in the United States. It manufactures and sells pistols and rifles, as well as ammunition, suppressors, electro-optics, and other firearm-related products. Between 2016 and 2023, Sig Sauer manufactured and entered into domestic commerce approximately 7.8 million pistols, representing 20.9% of all domestically manufactured pistols—the largest share attributable to any manufacturer during that period.

28. Originally a Swiss company, Sig Sauer began operating in the United States under the name SIGARMS in the 1980s and adopted the Sig Sauer name in 2007. Today, Sig Sauer operates approximately 1.5 million square feet of office, manufacturing, research and development, and training facilities in the United States. Its operations include firearm manufacturing in New Hampshire, electro-optics manufacturing in Oregon, and ammunition manufacturing in Arkansas.

29. During the Class Period, Sig Sauer distributed its Retail Firearms through a nationwide network of distributors and retailers, including BPS and Cabela's. BPS and Cabela's advertise and sell numerous Sig Sauer products, including Sig Sauer pistols and rifles, through their stores and websites.

30. During the Class Period, Sig Sauer sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

31. ***S&W.*** Smith & Wesson Brands, Inc. is a Nevada corporation with its principal place of business in Maryville, Tennessee.

32. During the Class Period, S&W manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

33. S&W is one of the largest Retail Firearms manufacturers in the United States. It manufactures and sells pistols, revolvers, rifles, shotguns, suppressors, firearm accessories, and related products under the Smith & Wesson and Gemtech brands. Between 2016 and 2023, S&W manufactured and entered into domestic commerce approximately 7.6 million pistols, representing 20.2% of all domestically manufactured pistols—the second-largest share attributable to any manufacturer during that period.

34. Smith & Wesson was founded in 1852 by Horace Smith and Daniel B. Wesson in Connecticut. Today, S&W manufactures its products at facilities in Maryville, Tennessee; Springfield, Massachusetts; and Houlton, Maine.

35. In October 2026, S&W acquired Savage Arms Inc. for $160 million. At the time of the acquisition, it was reported that "[c]ombining Smith and Wesson's existing presence in the handgun, revolver and semi-auto rifle market with Savages [*sic*] foothold in the long-gun, shotgun, suppressor and hunting markets, results in a full array of product offerings via a single company … instantly earning the title of the largest commercial firearms manufacturer in the U.S."[1]

36. During the Class Period, S&W distributed its Retail Firearms through a nationwide network of distributors, buying groups, and large retailers, including BPS and

[1] "Smith & Wesson Acquires Savage Arms for $160 Million," NRA (Oct. 21, 2026), *available at* https://www.nra.org/news/smith-wesson-acquires-savage-arms-for-160-million.

Cabela's. BPS and Cabela's advertise and sell numerous S&W products, including S&W pistols, revolvers, and rifles, through their stores and websites.

37. During the Class Period, S&W sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

38. ***Ruger.*** Sturm, Ruger & Company, Inc. is a Delaware corporation with its principal place of business in Mayodan, North Carolina.

39. During the Class Period, Ruger manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

40. Ruger is one of the largest Retail Firearms manufacturers in the United States. It manufactures and sells pistols, revolvers, rifles, shotguns, firearm accessories, and related products under the Ruger, Marlin, and Glenfield brands. Between 2016 and 2023, Ruger manufactured and entered into domestic commerce approximately 6.1 million pistols, representing 16.2% of all domestically manufactured pistols—the third-largest share attributable to any manufacturer during that period.

41. Ruger was founded in 1949. Today, Ruger conducts manufacturing and related operations at facilities in Newport, New Hampshire; Prescott, Arizona; Mayodan, North Carolina; Hebron, Kentucky; and Earth City, Missouri.

42. During the Class Period, Ruger Retail Firearms were sold through a nationwide network of distributors and retailers, including BPS and Cabela's. BPS and Cabela's advertise and sell numerous Ruger products, including Ruger pistols, revolvers, rifles, and shotguns, through their stores and websites.

43. Unlike other manufacturers, Ruger does not sell firearms directly to any retailers. Ruger sells only directly to a network of wholesale firearm distributors, who in turn sell firearms to retailers like Defendants BPS and Cabela's.

44. During the Class Period, Ruger sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

45. ***Glock.*** Glock, Inc. is a Georgia corporation with its principal place of business in Smyrna, Georgia.

46. During the Class Period, Glock manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

47. Glock is one of the largest Retail Firearms manufacturers in the United States. It manufactures, imports, and sells a broad line of semi-automatic pistols for consumers, law enforcement agencies, and military customers. Between 2016 and 2023, Glock manufactured and entered into domestic commerce approximately 2.9 million pistols, representing 7.8% of all domestically manufactured pistols.

48. Gaston Glock founded GLOCK Ges.m.b.H in 1963 in Austria. The company opened its United States headquarters and first subsidiary, Glock, Inc., in Smyrna, Georgia in 1985. Glock's Smyrna facility began full production operations in 2013.

49. During the Class Period, Glock distributed its Retail Firearms through a nationwide network of distributors and authorized retailers, including BPS and Cabela's. BPS and Cabela's advertise and sell numerous Glock pistol models through their stores and websites.

50. During the Class Period, Glock sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

51. ***FN.*** FN America, LLC is a Delaware company with its principal place of business in McLean, Virginia.

52. During the Class Period, FN manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

53. FN manufactures and sells pistols, rifles, suppressors, ammunition, accessories, and related products for consumers, law enforcement agencies, and the United States military. Between 2016 and 2023, based on data from the Bureau of Alcohol, Tobacco, Firearms and Explosives, FN manufactured and entered into domestic commerce approximately 652,000 pistols.

54. FN's history dates back to 1889 when Fabrique Nationale d'Armes de Guerre was formed to produce rifles for the Belgian government. FN opened a U.S. manufacturing plant in Columbia, South Carolina, in 1981.

55. During the Class Period, FN distributed its Retail Firearms through a nationwide network of distributors and authorized retailers, including BPS and Cabela's. BPS and Cabela's advertise and sell numerous FN products, including FN pistols and rifles, through their stores and websites.

56. During the Class Period, FN sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

57. ***Beretta***. Beretta U.S.A. Corp. is a Maryland corporation with its principal place of business located in Accokeek, Maryland.

58. During the Class Period, Beretta manufactured and distributed Retail Firearms for sale to purchasers throughout the United States, including members of the Class.

59. Beretta manufactures and sells pistols, rifles, shotguns, revolvers, firearm accessories, and related products for consumers, law enforcement agencies, and military customers. Between 2016 and 2023, Beretta manufactured and entered into domestic commerce approximately 675,000 pistols.

60. The Beretta brand was founded in 1526 in Gardone Val Trompia, Italy. Beretta entered the U.S. market in 1978. Its U.S. operations include its principal offices and service operations in Accokeek, Maryland, and firearm manufacturing and service operations in Gallatin, Tennessee.

61. During the Class Period, Beretta distributed its Retail Firearms through a nationwide network of distributors and retailers, including BPS and Cabela's. BPS and Cabela's advertise and sell numerous Beretta products, including Beretta pistols, rifles, and shotguns, through their stores and websites.

62. During the Class Period, Beretta sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

63. ***BPS.*** BPS Direct, LLC d/b/a Bass Pro Shops is a Delaware corporation with its principal place of business in Springfield, Missouri.

64. BPS has approximately 200 retail locations throughout the United States, as well as an internet storefront. BPS is one of the largest retailers of Retail Firearms in the United States.

65. At all relevant times, BPS sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

66. ***Cabela's***. Cabela's LLC is a Delaware company with its principal place of business in Sidney, Nebraska.

67. Cabela's has approximately 170 retail locations throughout the United States, as well as an internet storefront. Cabela's is one of the largest retailers of Retail Firearms in the United States. In 2017, BPS acquired Cabela's. Since the acquisition, Cabela's and BPS have operated under common ownership and control while continuing to use the separate BPS and Cabela's retail brands. The combined entities will at times be referred to as BPS/Cabela's in this Complaint.

68. At all relevant times, Cabela's sold Retail Firearms subject to anticompetitive pricing policies and joined the unlawful agreement to fix, raise, maintain, or stabilize prices of Retail Firearms sold in the United States.

69. ***Does 1-20***. Does 1 through 20 are firearm manufacturers, retailers, or other entities who participated in the conspiracy alleged herein and whose identities Plaintiff does not yet know. Plaintiff will amend this Complaint when their identities and roles are known.

70. ***Other Non-Parties.*** Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in

furtherance of the illegal conduct described herein. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

71. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

72. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions and any other affiliated companies.

## IV. FACTUAL ALLEGATIONS

### A. Retail Firearms

73. Retail Firearms fall into one of three broad categories: handguns (pistols and revolvers), rifles, and shotguns. Nearly all pistols sold today are semi-automatic pistols, so, unless otherwise specified, the term "pistol" used in this Complaint refers to semi-automatic pistols.

74. The manufacture and sale of Retail Firearms is regulated by the Gun Control Act. Federal law prevents retailers from selling machine guns and other fully automatic firearms. 18 U.S.C. § 922 (o).

#### *1. Handguns*

75. A handgun is any firearm designed to be held and fired without bracing it against the shooter's shoulder. These firearms are capable of being concealed on a person. The two main types of handguns are pistols and revolvers.

##### a. Pistols

76. A semi-automatic pistol is a type of handgun that uses a single chamber and barrel. The pistol fires a chambered round, extracts and ejects the empty casing and then

automatically loads a new round into the chamber (if additional rounds are in the magazine) with each trigger pull.



**Figure 1: Glock G17 Pistol.**

77. Pistols are the most popular type of firearm in the United States. In almost every year since 2010, the pistol has been the most produced type of firearm manufactured in the United States.




**Figure 2.**[2]

78. All the Manufacturer Defendants produce pistols, and they are dominant in this market. In fact, the six Manufacturer Defendants represent roughly two-thirds of domestic pistol production. Defendants Sig Sauer, S&W, Ruger, and Glock (in that order) are the top four largest pistol manufacturers in the United States.

[2] ATF, "Firearm Commerce Updates and New Analysis," (last updated August 27, 2026), *available at* https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking-investigations-volume-four.




**Figure 3.**[3]

**b. Revolvers**

79. A revolver is a handgun that contains a cylinder with multiple chambers. When the trigger is pulled, the cylinder rotates around a central pin to align the next chamber with the firing pin. A single barrel will fire one round per trigger pull.




**Figure 4: S&W Double Action Revolver.**

[3] Guns Down America, "Gun Industry Cohesion, Market Power, and Retail Pricing" (July 6, 2026), *available at* https://www.gunsdownamerica.org/action/the-price-is-wrong#download (hereafter, "GDA Report").

80. Defendants S&W, Ruger, and Beretta produce revolvers. Defendants S&W and Ruger are the first and third, respectively, largest revolver manufacturers in the United States.

### *2. Rifles*

81. A rifle is a long gun intended to be fired from the shoulder and designed to fire only a single projectile through a rifled bore for each single pull of the trigger.

82. Rifles are categorized mainly by their action: the mechanism that loads, fires, and ejects each cartridge. Three common types of rifles are bolt-action, lever-action, and semi-automatic.



**Figure 5: Ruger Bolt Action Rifle.**

83. Defendants Sig Sauer, S&W, Ruger, FN, and Beretta produce rifles. Defendants Ruger and S&W are the second and fourth, respectively, largest rifle manufacturers in the United States.

### *3. Shotguns*

84. A shotgun is a long gun intended to be fired from the shoulder and designed to fire a shotgun shell made up of a cloud of small pellets, or alternatively a single large projectile.

85. Three common types of shotguns are pump-action, semi-automatic, and break action.



**Figure 6: Beretta Semi-Automatic Shotgun.**

86. Defendants S&W, Ruger, and Beretta produce shotguns. Beretta is the fourth largest producer in the market.

**B. United States Firearm Sales and Distribution**

87. According to a 2023 survey, about four in ten adults in the United States live in a household with a gun and 32% personally own one. During the Class Period, approximately 200 million firearms were sold in the United States, generating billions of dollars in sales. A majority of gun owners—over 70%—say that personal protection is the main reason why they own a firearm. Approximately one-third of gun owners say that they primarily own a gun for hunting or shooting sports.




**Figure 7.**

88. Firearms move through a multi-level national supply chain. Firearm manufacturers, like the Manufacturer Defendants, sell to wholesale distributors who then resell to federally licensed firearm retailers. In some cases, firearm manufacturers skip the wholesalers and sell directly to large national retailers or independent retailers.

89. Firearm buyers, like Plaintiff and members of the Class, primarily purchase firearms through brick-and-mortar retailers, online sellers, or at gun shows.

90. All firearm retailers, including online-only retailers, must hold a valid Federal Firearms License ("FFL"). Holding an FFL to sell firearms has been required in the United States since 1968, with the passage of the Gun Control Act. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), an agency within the Department of Justice, issues FFLs. Businesses with a valid FFL are referred to as Federal Firearms Licensees and also go by the acronym "FFL."

91. When an individual purchases a firearm from an FFL, the Gun Control Act mandates that the FFL conduct a background check on the individual through the FBI's National Instant Criminal Check System ("NICS"). 18 U.S.C. § 922 (t).

92. Further, under the Gun Control Act, it is generally unlawful for an FFL to sell a firearm "to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)." 18 U.S.C. § 922 (c). Accordingly, firearms purchased through online FFL-retailers cannot be shipped directly to customers.

93. Instead, when a customer purchases a firearm from an online FFL-retailer, the online retailer will ship the firearm to a local FFL brick-and-mortar retailer (often referred to as an FFL dealer, or simply a dealer; these terms will be used interchangeably in this complaint) chosen by the customer. The local FFL dealer will then complete the NICS background check on the individual who is purchasing the firearm when that person arrives physically in the store. If the individual clears the background check, under ATF regulation, the local FFL dealer can transfer the firearm to the individual through an over-the-counter transaction where the buyer shows proper identification. 27 C.F.R. § 478.124.




**Figure 8.**

94. Prior to the mid-2010s, firearm demand fluctuated with political developments, particularly presidential elections, terrorism or wars, and national tragedies. Sales tended to increase under (and in anticipation of) presidential administrations who supported more firearm restrictions and in the wake of high-profile mass shootings. In both circumstances, consumers rushed to purchase firearms out of concern that new gun control measures would soon restrict their availability. The terrorist attacks on 9/11 and the ensuing War on Terror also led to an uptick in gun sales during a Republican administration, most often attributed to a sharp decline in Americans' feelings of personal safety.

95. The Obama administration provides a striking example of this pattern. Between 2008 and 2016, annual firearm-related background checks, as adjusted by the NSSF to better reflect firearm purchases, increased nearly 75%, from approximately 9 million to approximately 16 million—a record-setting number at the time. Manufacturers expanded production to meet this demand, with both Ruger and S&W reporting increases in manufacturing capacity during this period.

96. But that demand declined following the 2016 presidential election. NSSF-adjusted background checks fell to approximately 14.6 million in 2017 and 13.7 million in 2018. The decline left manufacturers with excess production capacity and distributors and retailers holding unsold firearms. Ruger identified excess industry manufacturing capacity as a factor contributing to weaker sales, while S&W reported that excess inventory from multiple manufacturers had slowed new firearm orders.

97. The pattern of sales booms and busts following political winds or gun-related tragedies became fundamentally altered by the mid-to-late 2010s. After the 2016 election, mass shootings—including the Las Vegas music festival massacre in 2017 and Parkland school shooting in 2018—were followed by less aggressive and less successful efforts to curb access to guns and thus no longer produced reliably strong increases in firearm sales. But then, even though a Republican was in the White House, firearm demand surged during the COVID-19 pandemic and wave of protests. This time, demand was driven by new concerns about personal safety, personal identity, and group allegiance. In March 2020, approximately 2.4 million firearm-purchase-related background checks were conducted, an 80% increase over March 2019. For the full year, NSSF-adjusted background checks reached approximately 22 million, a 60% increase over 2019. A gun safety group report noted that this rise in demand was "partially in response to gun lobby propaganda that social unrest was inevitable and that the government would not protect them."

98. Although firearm sales declined from their 2020 peak, the increase associated with the COVID-19 pandemic and the concurrent social unrest did not fully dissipate. Based on the sales data in Figure 7 (*supra*), estimated firearm sales averaged approximately 18.1 million annually from 2020 through 2025—about 30% above the approximately 13.8 million annual

average from 2010 through 2019. Even excluding the extraordinary 2020 peak, estimated sales from 2021 through 2025 averaged approximately 17.1 million annually, roughly 24% above the pre-2020 average.

### C. The Firearms Industry Collectively Cultivated and Reinforced Price-Insensitive Demand for Retail Firearms with the Assistance of Trade Associations, Influencers, and Others

99. Unlike in other industries, members of the firearms industry generally do not engage in widespread marketing touting the attributes of their branded products in mass media. Instead, for decades, Defendants have spent substantial sums promoting firearm ownership generally, carried out by organizations they help finance, such as NSSF and the National Rifle Association ("NRA"), as well as through targeted media outlets and marketing platforms.

100. Beginning in the mid-to-late 2010s and continuing through the Class Period, these marketing efforts changed both in terms of message and forum. Internet-based marketing and sales exploded. The quick expansion of social media sites such as Twitter and Reddit, as well as streaming video apps and websites (including YouTube, TikTok, and Facebook's new video streaming feature), gave rise to the era of "influencers," individuals who garnered large followings and often used their online platforms to explicitly or implicitly market products for commercial businesses, in return for free products, cash, or other benefits. In addition, the 2016 election, the COVID-19 pandemic, and the wave of protests and social unrest beginning in summer 2020, and the social and cultural debates they engendered, were frequent topics of conversation and social media posts.

101. The firearms industry noticed this change in the national conversation and took advantage of it. Industry messaging became more fear-based. It associated firearm ownership with maintaining personal safety in the face of new and vaguely-defined threats and membership in a broader cultural community. Moreover, the industry communicated that conspicuous

consumption and display of firearms was an important way of displaying one's patriotism and community identity.

102. The objective of such messaging was not always to sell a particular brand or type of firearm, or to fill a genuine need or desire for a firearm for a particular purpose (such as for hunting). Instead, it was to cultivate fears and cultural identities that made firearm ownership in general seem increasingly necessary or desirable. By giving consumers reasons to purchase firearms beyond their immediate functional utility, the industry thus sought to make demand less responsive to price. Consumers who viewed firearm ownership as necessary for their general safety or as an expression of identity were less likely to postpone or forgo a purchase when prices increased and when no immediate, tangible threat appeared.

103. Such industry-wide promotion appears to have been successful, because it is correlated with a trend in which consumer demand for firearms is relatively insensitive to price increases. A 2023 economic study analyzing consumers' firearm-purchasing preferences found that demand was relatively price-inelastic, particularly among existing firearm owners. The study estimated that a 10% increase in firearm prices would reduce the likelihood of purchasing a firearm by only 1.25 percentage points.[4] During the Class Period, therefore, the industry operated in a market (and, in fact, cultivated that market) in which maintaining higher prices would not necessarily produce a proportionate reduction in purchases.

104. The result was a feedback loop: social engineering by Defendants and the rest of the firearms industry stimulated firearm purchases, and then increased sales generated additional revenues for Defendants at supracompetitive prices due to the price-fixing conspiracy, portions

[4] Sarah Moshary, Bradley Shapiro & Sara Drango, *Preferences for Firearms and Their Implications for Regulation* 4, 28 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30934, Feb. 2023), https://www.nber.org/papers/w30934.

of which were funneled back into monetary and sponsorship support for NSSF, NRA, and other groups financing that social engineering.

105. Firearm manufacturers, including the Manufacturer Defendants, expressly encouraged collective support for this industry-wide strategy. For example, at NRA's 2013 annual meeting, Defendant S&W was inducted into the organization's Golden Ring of Freedom, which recognized significant financial donors. In an NRA promotional video commemorating the recognition, James Debney, former CEO of S&W's parent company, urged others to "step up and support the NRA," explaining that "[t]hey are our voice" and "a united voice."[5]

106. While none of the Manufacturer Defendants reveal publicly how much money they contribute to the NRA and NSSF for marketing purposes, public reports indicate the amount contributed is in the tens of millions collectively and that such contributions are expected of all corporate members.

107. As described below, manufacturers and industry organizations, including Defendants, invested substantial resources in media programming and other efforts to cultivate public anxieties and reinforce firearm ownership as a response.

108. The collective support that Debney urged in his 2013 speech manifested itself in 2016, when the NRA expanded its longstanding NRA News operation into NRATV, a 24-hour streaming television network featuring more than 30 series across four channels. Several Manufacturer Defendants helped finance this programming. For instance, Ruger sponsored the NRA News channel, S&W sponsored the NRA Women channel, and Sig Sauer sponsored

[5] Violence Pol'y Ctr., *Blood Money II: How Gun Industry Dollars Fund the NRA* 8, 10 (Sept. 2013), https://vpc.org/studies/bloodmoney2.pdf (transcribing an NRA video recognizing its 2013 Golden Ring of Freedom inductees).

*Defending Our America*, a series carried on NRA News. Cabela's Outdoor Fund was also a sponsor.

109. In a 2020 study of 220 NRATV videos posted to Twitter over a six-month period in 2017–18, communications scholar Adam Klein found that only 24 videos (11%) addressed general gun ownership or Second Amendment rights. The remaining 196 videos (89%) focused on perceived ideological opponents, such as the news media and social-issue protest movements. Klein found that NRATV portrayed these groups as dangerous domestic threats rather than ordinary political opponents, transforming the NRA's traditional message of self-defense into a call to arms, explicit or implicit, against perceived cultural opposition.

110. While NRATV was discontinued in 2019, the Manufacturer Defendants' collective investment in social engineering content continued via a new company, Gun Talk Media. Defendants FN, Ruger, Sig Sauer, and S&W continued to sponsor Gun Talk Radio, while Defendants Glock, Ruger, Sig Sauer, and S&W sponsor Gun Talk Media's television series, *Guns & Gear*. Gun Talk Media, like NRATV, employs the firearms industry's tried-and-true demand stimulating strategies.

111. The firearms industry also relied on social media influencers to make firearm ownership part of an attractive cultural identity. Several Defendants, including Sig Sauer, FN America, and BPS/Cabela's, have sponsored or developed other commercial relationships with prominent influencers who, in their videos and other social media posts, promote the use of firearms, sometimes alongside social commentary in line with Defendants' messaging. BPS/Cabela's has even invited influencers to create an action-comedy video featuring tactical firearms in its stores. In addition, some Defendants, including Sig Sauer and S&W, have publicly fundraised for, or collaborated on special products with, certain organizations, including those

whose self-stated goals are to fight the "culture wars" and make military-style firearms culturally appealing.

112. Defendants and their self-funded industry groups also invest in expanding the reach of firearms influencers through the Gundie Awards (referred to as the "Gundies"), an annual, publicly voted awards ceremony created by firearms-industry marketing agency Forge Relations. Gundies co-founder Ben Stacy explained that the "entire goal" was to "expand this community" by elevating online creators whose entertaining content provides a "gateway or an on ramp" into firearms ownership. Defendant Sig Sauer sponsored the inaugural Gundies in 2020 and returned as a sponsor in 2026, while Beretta sponsored the 2025 ceremony and its "Best Shooter" award category. Another Gundies co-founder, Will Renke, emphasized that the event would be impossible "without the sponsors" and was not about "one particular sponsor," but about "everyone coming together." Some speeches during the Gundies have reinforced messages similar to those promoted through NRATV and online influencers, including at the 2024 and 2026 ceremonies.

***

113. The mostly industry-wide efforts described above required substantial expenditures by firearm manufacturers. Unlike conventional advertising focused on a particular manufacturer's products, these efforts often sought to stimulate demand for Retail Firearms generally. Each manufacturer's investment therefore largely benefited its competitors as well as itself.

114. This created a problem: after spending heavily to expand the market, manufacturers still risked competing away the resulting profits by undercutting one another on price. That competition could pass much of the benefit of their industry-wide investments to

consumers through lower prices, rather than allowing manufacturers to retain it as profits. The Manufacturer Defendants therefore shared a powerful financial incentive to limit price competition and preserve the returns on their investments in generating demand.

115. The price fixing conspiracy described below supplied a mechanism for doing so. Through MAP and other pricing policies, the Manufacturer Defendants limited retailers' ability to advertise and communicate discounts. The restrictions reduced retail price competition, much to the benefit of cost-heavy retailers like BPS/Cabela's, and allowed the Manufacturer Defendants to retain the benefits of sustained industry-wide demand. The combination of relatively inelastic demand and industry-wide demand-generation made adherence to the alleged pricing arrangement more profitable for each Manufacturer Defendant and allowed the conspiracy to stick.

### D. Anticompetitive Conduct

116. During the Class Period, Defendants have engaged in a price fixing conspiracy to raise the prices of Retail Firearms to the detriment of Plaintiff and members of the Class. Specifically, each Manufacturer Defendant agreed to enforce a MAP or functionally equivalent minimum-price program with knowledge that its competitors were mutually agreeing to the same.

#### *1. MAP and Related Minimum-Price Policies Restrict Price Competition Throughout the Firearm Distribution Chain*

117. MAP and similar policies are intended to stabilize the price of products and are used in many industries, both lawfully and unlawfully. A MAP policy establishes the lowest price at which a distributor, retailer, or other reseller may publicly advertise a covered product. Manufacturers generally issue MAP schedules identifying the prescribed price for each covered product or SKU. Unlike a manufacturer's suggested retail price ("MSRP"), which purports

merely to recommend a price, a MAP policy attaches consequences to advertising below the prescribed floor, including warnings, suspension of shipments, loss of authorized-dealer status, or termination of the reseller's access to the manufacturer's products.

118. MAP policies commonly define "advertised" broadly to include prices displayed on retailer websites, online marketplaces, social-media pages, emails, print advertisements, in-store signage, and other communications visible to consumers. Many policies also restrict methods that retailers might otherwise use to communicate or provide a lower price, including coupons, promotional codes, rebates, bundles, free products, "call for price" messages, and prices revealed after an item is placed in an online shopping cart. Manufacturers monitor compliance through automated internet searches, third-party monitoring services, and violation reports submitted by distributors and competing retailers. Departures from the prescribed price are generally permitted only when the manufacturer authorizes a temporary promotion or, as the Manufacturer Defendants refer to it, a "MAP holiday" (described below).

119. The MAP policies at issue in this Complaint restrain competition and keep prices artificially inflated in at least two ways. First, they prevent retailers from attracting customers by publicly offering lower prices. Because a retailer cannot advertise its discount, the retailer is less likely to gain enough additional sales to justify reducing its price. Second, the manufacturer-prescribed price becomes the visible reference point—and, frequently, the starting and end point—for any transaction. Even when a policy nominally permits a retailer to complete a sale below MAP, consumers may never learn that a lower price is available, and retailers may be unwilling to risk their supply relationship by offering one. MAP therefore tends to increase both advertised and actual transaction prices.

120. In the firearms industry, the distinction between the advertised price and the actual selling price has largely disappeared. Generally, retailers do not meaningfully deviate below the prescribed MAP price. The MAP price displayed to consumers is therefore the price that consumers pay in most situations, causing MAP to operate as an actual minimum resale price rather than merely a restriction on advertising.

121. The firearms industry also uses minimum transfer prices ("MTP"), suggested distributor retail prices, minimum distributor resale prices, and functionally equivalent restrictions. As used here, MTP refers to the minimum price at which a wholesaler or distributor may sell or transfer a product to a retail dealer; it does not refer to the fee charged by an FFL for transferring a firearm to a consumer.

122. Distributor-level policies may prohibit wholesalers from selling below the prescribed price directly or indirectly through rebates, credits, cooperative-advertising payments, free goods, bundled products, or other incentives for customers. They may also require distributors to communicate manufacturer pricing rules to dealers, investigate reported violations, refuse sales to unauthorized or noncompliant resellers, and provide information enabling the manufacturer to enforce its policy.

123. All these price-related restraints, used by the Manufacturer Defendants and applied at different levels of the market, are complementary. MTP and distributor resale floors restrict competition over the dealer's acquisition cost, while MAP restricts the price that dealers can communicate to consumers. Monitoring, reporting, and supply sanctions reinforce both levels of the system. When a manufacturer threatens to withhold products from dealers that sell below MAP, or from distributors that continue supplying those dealers, the purported advertising policy operates as a *de facto* minimum retail-price or resale-price-maintenance policy. Together,

these restraints make it harder for retailers and distributors to compete by lowering prices, reducing pressure on manufacturers to lower their own prices or offer concessions. By limiting price competition throughout the distribution chain, these policies help keep the price of Retail Firearms artificially inflated.

124. But, in the firearms industry, maintaining these price floors created a problem—in part because firearm demand fluctuates seasonally and in response to certain events. When sales slow, retailers may wish to advertise lower prices to attract buyers and clear unsold inventory. Strict MAP enforcement prevents them from doing so, and as inventory accumulates, retailers risk being left with firearms they cannot sell, while manufacturers risk losing new orders from retailers that already have too much inventory.

125. The Manufacturer Defendants use MAP holidays collectively to relieve this pressure without abandoning the underlying price restraints. During a MAP holiday, manufacturers temporarily suspend or relax MAP, allowing retailers to advertise lower prices during designated promotional periods. Manufacturers and retailers plan these holidays in advance, giving retailers predictable opportunities to discount and clear inventory. Knowing that they will have an opportunity to lower prices during an upcoming promotion reduces the pressure to discount during slower periods, making it easier to maintain the ordinary price floors. Once a MAP holiday ends, those restrictions resume.

126. But MAP holidays create a separate problem for firearm retailers: although discounting helps them move inventory, selling firearms at lower prices reduces their profit margins. Manufacturers can offset those losses through "markdown money"—cash payments or free goods provided to retailers to compensate for reduced margins during promotions. As alleged below, BPS demanded markdown money from its firearm suppliers during MAP

holidays. These payments allow retailers to clear unwanted inventory at discounted prices without absorbing the associated losses in profit margins suffered as a result of normal competition. Clearing that inventory, in turn, frees retailers to purchase more firearms from manufacturers.

127. Together, these practices help make the pricing arrangement durable across fluctuations in firearm demand. During ordinary periods, MAP and related restraints limit price competition. When demand slows, planned MAP holidays allow retailers to clear inventory and make room for new orders, while markdown money protects retailers' margins during those promotions. Once the holidays end, the ordinary price floors resume. The system is thus designed to withstand the recurring downturns that would otherwise undermine the pricing restraints, allowing manufacturers to maintain artificially elevated prices over time rather than only during periods of strong demand.

128. As described below, brick-and-mortar retailers and wholesalers pressed firearm manufacturers to adopt and enforce precisely these kinds of restrictions, and firearm manufacturers, including the Manufacturer Defendants, agreed among themselves to do so.

#### 2. ***Retailers and Wholesalers Pressed Manufacturers to Agree to Restrain Online Price Competition***

129. The growth of internet firearm sales intensified retail price competition in the early 2010s. Online retailers could advertise nationally, reach consumers outside their immediate geographic areas, and operate with lower overhead than stores with large showrooms, inventories, and staff. A consumer could examine a firearm at a brick-and-mortar store, find a lower price online, and have the firearm shipped to a local FFL for the required transfer.

130. Because an "online" firearm purchase requires the buyer's physical presence at a brick-and-mortar store to complete the purchase, that means the online dealer who made the

initial sale and the brick-and-mortar dealer who completes the sale can be different companies—in fact, direct competitors. For instance, a consumer can purchase a Sig Sauer pistol from a large online retailer (e.g., Primary Arms) by placing the pistol in an online shopping cart, providing payment and billing information, and designating a local FFL to receive the firearm. The online retailer collects the purchase price and ships the pistol to the selected FFL. The consumer then appears at the FFL's brick-and-mortar location, presents identification and undergoes the required background check. If the transfer is approved, the FFL releases the pistol to the consumer and may collect a separate transfer fee; it does not receive the purchase price paid for the firearm. Thus, if the receiving FFL is a Cabela's location that accepts third-party transfers, Cabela's may transfer the same Sig Sauer pistol that it sells in its own stores and online, but it did not make *this* sale or receive the associated retail margin. The online retailer obtained that sale without bearing Cabela's costs of maintaining a nationwide brick-and-mortar network. In a competitive market, Cabela's recourse would be to compete on price or service.

131. In 2012, the magazine *Shooting Industry* reported that nearly 95% of the more than 330 firearm retailers it surveyed performed transfers for firearms purchased online, and that 45% had only begun doing so during the preceding five years.

132. Accordingly, brick-and-mortar retailers and the wholesale distributors who sell to those dealers viewed internet competition as a threat to their margins and business model. Rather than respond only by lowering their own prices or improving service, influential dealers pressed manufacturers to stop online sellers and other discounters from advertising covered products below manufacturer-prescribed floors.

133. In 2014, several dealers raised their concerns publicly in an article in *Shooting Industry*. For instance, Miles Hall, owner of H&H Shooting Complex in Oklahoma, said,

"[w]e're now feeling the new trend is a 'race to the bottom' on pricing." Kimberly Stafford, owner of Tejas Shooting Sports in Odessa, Texas, mentioned continued competition from the internet. Related to MAP pricing specifically, Richard Sprague, president of Sprague's Sports in Yuma, Arizona, said the following:

> The biggest challenge I see for 2015 is . . . growing partnerships with those manufacturers who will offer the best support to the independent retailer—MAP pricing and co-op support are high on our radar . . . . ***Manufacturers could help by implementing strong MAP pricing policies and actually enforcing them.*** It seems like my job is to educate the consumer about a product so they can go home and price-shop us out of business. Our priority will be to identify which manufacturers and companies will be the very best partners to do business with. ***If we find no MAP policy in place, or if we see a certain company's product is being footballed online, then we'll stop giving that company's product retail space exposure and pursue alternatives.*** . . . it's simply survival and supporting those manufacturers that support us. [6]

134. While a manufacturer may be sympathetic to hearing such complaints, in a competitive market, taking the unilateral step to institute a MAP policy would leave it vulnerable to its own competitors; their products would be overpriced compared to similar products not subject to a MAP policy, and consumers would almost certainly shift at least some of their purchases to lower-priced competition. Thus, after hearing the above-referenced comments from people in the firearms industry like Sprague and others, by 2015 the Manufacturer Defendants understood that they needed to take *collective* action to (a) keep distributors and brick-and-mortar retailers happy by reducing or ending their need to compete on price, and (b) keep their own profits high.

[6] Jade Molde, "Dealers: Facing The Challenges," *Shooting Industry* (December 2014). *See also* Champe Barton, "Gunmakers Coordinated With Retailers to Keep Gun Prices High, New Report Alleges," *The Trace* (Jul. 13, 2026), *available at* https://www.thetrace.org/2026/07/gun-industry-price-fixing-report.

### *3. 2015 NASGW Webinar and Sig Sauer's MAP Policy*

135. On September 17, 2015, NASGW and Growth Strategy Partners, a management consulting firm, held a webinar titled "Listen and Learn: Obtaining Customer Feedback and Input to Grow Sales and Profits." The panelists for the webinar were Jeff Creamer, an executive director at Defendant Sig Sauer; Jens Krogh, director of sales and marketing at firearm manufacturer STI Guns (n/k/a Staccato); and consultants Christopher DiCenso and George Harris. The panelists noted at the top of the webinar that "***about 75% listening are [firearm] manufacturers***" with the others being distributors or other organizations. Listeners included presidents, CEOs, and business development employees.

136. During the webinar, Sig Sauer's Jeff Creamer explained that Sig Sauer's sales representatives were hearing nationwide complaints that Sig Sauer was "not the easiest to do business with." Sig Sauer then selected more than 100 dealers for a scripted survey, including dealers with no previous direct Sig Sauer relationship. According to Creamer, the "biggest frustration" dealers complained of was the absence of a "formal MAP policy" and the resulting "negative margin pressure . . . through internet-only retailing." Sig Sauer then reported having follow-up conversations with brick-and-mortar, internet, and chain stores, on "the whole gamut of MAP." ***Additionally, Creamer revealed to the audience that Sig Sauer had follow up conversations with "other manufacturers that aggressively enforce MAP and set a hard MAP policy."***

137. After those conversations, Sig Sauer decided that the "best thing to respond to frustration in the field" was to have a formal MAP policy. Sig Sauer conducted the survey in April 2015 and instituted the MAP policy on July 1, 2015.

138. Creamer stated that Sig Sauer had hired staff to monitor and enforce the MAP policy. The MAP policy is more than a policy "just on paper," Creamer said it "has teeth." He

said, "we wanted everyone to play on a level playing field, so we employ technology to crawl looking for MAP violations."

139. Additionally, Creamer said "the dealer base as a whole is pretty willing to help identify . . . competitors violating" the policy. Creamer said the dealers that were initially frustrated with Sig Sauer are now giving positive feedback. Key partners have told Sig Sauer now there is "a level playing field" and they are not competing on price.

140. Sig Sauer—one of the biggest players in the market—did not need to explain *any* of this to its competitors. The fact that Sig Sauer was voluntarily speaking to an audience of its direct competitors, revealing proprietary internal data and pricing strategies, and emphasizing that the company's decision on pricing was based on collective input, sent one unmistakable message: we have instituted MAP and it is *now safe for others to do the same*.




**Figure 9: Screenshot from NASGW Webinar.**

141. Thus, firearm manufacturers listening to the NASGW webinar understood from Sig Sauer what its direct competitors had recommended, what retailers expected, and how to comply: adopt and enforce a formal MAP policy, use automated monitoring and dealer reports to

detect violations, and impose meaningful sanctions on noncompliant retailers so the policies had "teeth." Sig Sauer had not simply made a private, unilateral decision regarding its business practices; it was *teaching that strategy* directly to horizontal competitors and implicitly assuring them that Sig Sauer would not be undercutting them if they followed.

142. Accordingly, in or around the time of the NASGW webinar, the Manufacturer Defendants shared an understanding that minimum retail prices could be sustained only if competing manufacturers adopted and vigorously enforced MAP or functionally equivalent pricing policies. Sig Sauer's presentation supplied a common blueprint and signaled what each manufacturer could expect from the others: manufacturers without formal policies would adopt them and enforce them, manufacturers with existing policies would strengthen their enforcement, and each could proceed with the expectation that its competitors would do the same.

#### ***4. BPS Obtained Commitments from the Manufacturer Defendants to Implement and Enforce Anticompetitive Pricing Policies***

143. While Sig Sauer's call to action in 2015 may have signaled the beginning of the conspiracy, it took additional time and effort to convince other Manufacturer Defendants to institute or fully enforce their MAP policies. In 2017, BPS convened a large supplier meeting and used that meeting, together with separate manufacturer-specific communications over approximately the following year, to obtain commitments from competing firearm manufacturers to implement and enforce MAP and other resale-pricing policies.

144. BPS convened the supplier meeting in Springfield, Missouri, where it is based. The meeting brought together approximately 150 to 200 high-level executives from firearm manufacturers, ammunition manufacturers, and other industry suppliers. Other retailers were not invited. Representatives of each Manufacturer Defendant or its affiliated companies attended.

145. The meeting occurred around the completion of Johnny Morris's Wonders of Wildlife National Museum & Aquarium, which firearm manufacturers, including Defendant Beretta, and other industry suppliers had helped fund. Johnny Morris, for whom the museum is named, is the founder and CEO of Defendant BPS.

146. The first iteration of the museum opened in 2001 as Wonders of Wildlife–American National Fish and Wildlife Museum. After closing temporarily in 2007 for significant renovations, Johnny Morris's Wonders of Wildlife National Museum & Aquarium had its grand opening on September 21, 2017. The redone museum spans 350,000 square feet with over 1.5 miles of trails, and houses wildlife galleries and a large aquarium. It is located next to Bass Pro Shops National Headquarters in Springfield, Missouri.

147. Around the same time, BPS completed its acquisition of Cabela's. BPS and Cabela's announced the transaction on October 3, 2016, and completed it on September 25, 2017—just a few days after the renovated museum opened. The approximately $5 billion acquisition brought two of the country's largest outdoor retailers under common ownership and substantially expanded BPS's nationwide retail footprint and purchasing power.

148. Attendees spent the first portion of the meeting praying in a megachurch-like environment led by BPS leadership. After the opening portion, BPS gave an extended presentation to the assembled supplier executives concerning BPS's size, nationwide reach, and importance to their businesses.

149. Following the supplier meeting, BPS met or spoke separately with each manufacturer. Through manufacturer-specific meetings and telephone calls, BPS presented its requirements and told each manufacturer what it needed to do to continue receiving favorable treatment. Specifically, BPS demanded that each manufacturer adopt or enforce MAP or other

minimum-pricing restrictions, and that firearm manufacturers prevent other retailers, particularly online retailers, from advertising or selling their products below the prices BPS expected to charge.

150. BPS also told each manufacturer the margins it expected to receive on the products that it sold and, toward that end, demanded "markdown money." Markdown money refers to cash payments or free goods provided by a manufacturer to compensate BPS for decreased margins during MAP holidays. BPS made these demands of each manufacturer.

151. BPS enforced those demands through its control over shelf space. Firearm manufacturers that did not comply risked losing prime shelf positions in BPS stores. For manufacturers, the choice was to agree to BPS's demands or lose access to valuable shelf space and promotional opportunities.

152. BPS presented substantially similar categories of requirements to each Manufacturer Defendant. BPS communicated them to each manufacturer individually through meetings, telephone calls, or both.

153. These manufacturer-specific discussions occurred over approximately the year following the Springfield supplier meeting.

154. The BPS-manufacturer discussions were openly discussed among competing manufacturers. As BPS separately presented these requirements to the manufacturers, representatives of competing manufacturers, including all Manufacturer Defendants, discussed BPS's demands with one another in various informal settings. They asked one another whether they intended to follow through on those demands. Although some manufacturers complained about BPS's requirements, they assured one another that they would comply.

155. These manufacturer-to-manufacturer communications allowed competing manufacturers to confirm that BPS was seeking comparable commitments from their rivals and to determine whether those rivals intended to accept BPS's requirements. Ultimately, the participating manufacturers agreed to comply with the MAP and other pricing requirements that BPS demanded, as well as its requirements concerning margins and markdown money.

#### ***5. Other Retailers Pressed Manufacturers to Enforce MAP***

156. Retailers other than BPS/Cabela's also made demands for MAP enforcement and confirmed that fixing prices was the primary, if not only, motivation—that is, creating a "level playing field" in which retailers no longer have the ability to compete on price.

157. In a 2021 *Shooting Industry* article, Ethan Sansoni, general manager of FrogBones Family Shooting Center in Melbourne, Florida, described himself as a "big supporter" of Sig Sauer's efforts to "[help] raise and enforce the tides of fair margins for their dealers," even though he did not "agree with being told what he can and cannot sell something."[7]

158. Retailers expressed similar views in a 2023 *Shooting Industry* article. When asked whether MAP policies helped his business, Jeff Poet, president of Jay's Sporting Goods in Clare, Michigan, responded: "Absolutely MAP pricing helps if the MAP gives a decent margin. If it doesn't give a decent margin, it can hurt as much as it helps." David Rich, owner of Naples Gun Shop & School in Naples, Florida, likewise responded: "Absolutely! Enforced MAP policies help level the playing field with online-only companies."[8]

---

[7] Doug VanderWoude, "Margin Boost," *Shooting Industry* (2021), *available at* https://shootingindustry.com/discover/margin-boosters.

[8] Shannon Farlow, "Outbox Big-Box Stores," *Shooting Industry* (2023), *available at* https://shootingindustry.com/discover/monthly-features/outbox-big-box-stores.

159. These statements show that retailers viewed MAP as a means of preserving margins and neutralizing price competition from online sellers. MAP provided that protection only if manufacturers enforced their policies across the retail channel; a retailer constrained by MAP otherwise remained vulnerable to competitors permitted to advertise lower prices. The statements thus reflect continuing retailer pressure for uniform and vigorous enforcement—the same pressure BPS/Cabela's exercised on a much larger scale, in private, and by bringing competing manufacturers together to solve their common "problem" of retail competition.

#### ***6. The Manufacturer Defendants Enforced Analogous Minimum-Price Programs***

160. The Manufacturer Defendants did not begin from identical positions. Some had maintained MAP or other minimum-price policies before the Class Period (although the strength and enforcement of those sporadic policies seemed dubious by 2015), while others, including Sig Sauer, adopted formal policies in response to retailer pressure in or after 2015. By the start of the Class Period, however, the Manufacturer Defendants collectively understood that unilateral, written policies alone could not sustain minimum retail prices. Each manufacturer needed to enforce comparable restraints vigorously, and each could proceed with the expectation that its competitors would do the same. After Sig Sauer's institution of a MAP policy, other Manufacturer Defendants without formal policies adopted them, while manufacturers with existing policies strengthened their enforcement so that the policies had "teeth."

161. The Manufacturer Defendants used different names and mechanisms to institute pricing restraints. Some called the restraint MAP, some supplemented MAP with a minimum transfer price or MTP, some used a distributor resale floor, and some used a combination of restraints. Regardless, their programs shared a common objective: prevent unauthorized

discounting, protect margins at the expense of customers, and discipline dealers or distributors that departed from their prescribed price.

162. The policies also shared operational features. They applied across digital and print advertising; restricted coupons, bundles, shopping-cart displays, or other methods of communicating a lower price; enlisted distributors and dealers to identify violations; and threatened warnings, do-not-sell designations, supply suspensions, termination, or loss of authorization when a retailer or distributor failed to comply. In practice, MAP commonly became the expected transaction price rather than merely an advertising rule.

163. These shared objectives and operational features constitute parallel conduct. A Manufacturer Defendant's self-serving characterization of its pricing restraint as "unilateral" does not determine whether it was independently adopted or maintained as opposed to the product of collusion. As alleged below, the Manufacturer Defendants collectively adopted, maintained, and enforced these substantially similar restraints in response to retailer demands and their own desire to avoid competition, with knowledge that BPS/Cabela's was seeking comparable commitments from competing manufacturers and with assurances from those competitors that they would comply.

**a. Sig Sauer**

164. As described above, Sig Sauer implemented its current MAP policy in or around 2015, following the dealer survey it conducted.

165. A publicly available version of Sig Sauer's MAP policy from 2018 says that retailers were to "provide value to their customers, rather than competing through 'price wars.'" The policy makes clear that acceptance of the policy is a necessary condition to sell Sig Sauer's firearms.

166. The policy reaches virtually every method by which an online retailer could communicate or provide a discount. It prohibited listing below-MAP prices anywhere in an online listing, “hidden or visible,” including as a starting bid, “Buy it Now” price, reserve price, or minimum bid. It further provided that “MAP includes online ‘click for price,’ ‘in the cart pricing,’ checkout pricing, or any automated price features.” Automatic coupon codes, links to special pricing, price-matching offers, and automated responses to pricing requests were also prohibited. Even “[p]rivate messaging below MAP pricing” constituted a violation.

167. Sig Sauer combined these restrictions with a detection and enforcement system. Marketplace sellers were required to register every name and alias they used. Sig Sauer currently states on its website that “[s]elling without registering . . . a username or alias is a violation of the SIG SAUER MAP Policy.”[9] Further, products sold by unauthorized resellers could be “randomly tracked” to determine the source of the resale if those sales violate MAP.

168. The policy enumerated the following escalating penalties for not abiding by Sig Sauer’s MAP pricing, including placement on a “Do Not Sell” list:

[9] Website Terms of Sale (last accessed October 9, 2026), *available at* https://www.sigsauer.com/terms-of-sale.

8. **Penalties** – Resellers can sell products at any price. However, if advertised, published, or promoted prices, on Select Products, are below SIG SAUER MAP, then there are escalating consequences:

| Violation | Type | Penalty |
|---|---|---|
| 1st Violation | Print or non-immediate format | Violation Warning |
| 1st Violation | Social Media (including forums, chat rooms, etc.) | Immediate removal of post or 30 day placement on Do Not Sell List |
| 1st Violation | Online | 1 business day to correct or 2 week placement on Do Not Sell List |
| 2nd Violation | Social Media (including forums, chat rooms, etc.) | Indefinite placement on Do Not Sell List |
| 2nd Violation | Any | 30 days on Do Not Sell List |
| 3rd Violation | Any | 180 days on Do Not Sell List |
| 4th Violation | Any | Indefinite placement on Do Not Sell List |

9. **Do Not Sell List** – This list will be updated weekly and SIG SAUER will not sell to any resellers on this list. This list will be provided to SIG SAUER distributors, and the SIG SAUER Distribution Agreement does not allow sales to any dealer/reseller listed on the Do Not Sell list, either directly from the distributor to the dealer/reseller, or from a Distributor's dealer/reseller to a secondary dealer/reseller, which constitutes "sub-distributing" – which is strictly prohibited.

**Figure 10.**

169. Finally, Sig Sauer controlled when retailers could depart from its price floors. The policy provided that Sig Sauer could "periodically pre-announce 'MAP holidays' when prices may be adjusted below MAP."

170. Sig Sauer enforced this policy on offending retailers. For instance, in 2018, John Kielbasa, owner of Fernwood Firearms in Hankins, New York, advertised Sig Sauer inventory below MAP. When Sig Sauer found out about the price drops, it reminded Kielbasa that he had agreed not to advertise the company's guns below a minimum price. Sig Sauer threatened to cut off his supply unless he raised the advertised prices. Kielbasa complied. Kielbasa later said the gun business was "lopsided" in favor of bigger retailers (such as Defendants BPS and Cabela's)

who can negotiate compensation for unsold stock. He felt his hands had been "tied by manufacturers who enforced minimums on price."[10]

**b. S&W**

171. S&W implemented a nationwide "Minimum Advertised Price Policy" in or around 2018.

172. A publicly available version of the policy indicates it applies to internet advertisements, websites, social media, email, coupons, mobile applications, price tags, public signage, and displays at consumer and industry shows. "Any advertising method that provides for or suggests a price below the minimum advertised price" violates the policy.

173. S&W treated rebates, coupons, promotions, giveaways, free or discounted products, and retailer loyalty programs as violations when they reduced the effective advertised price below MAP. It also prohibited statements such as "Click here for Lower Price," "Add to Cart for Lower Price," and "Check Cart for Lower Price." On internet-auction and marketplace sites, "[n]o pricing below MAP may be listed, hidden or visible," including through starting bids, reserve prices, minimum bids, or GunBroker's "Take A Shot" feature.

174. S&W imposed the following escalating sanction schedule for violations, in form and in substance strikingly similar to Sig Sauer's:

---

[10] Champe Barton, "Gunmakers Coordinated With Retailers to Keep Gun Prices High, New Report Alleges," *The Trace* (Jul. 13, 2026), *available at* https://www.thetrace.org/2026/07/gun-industry-price-fixing-report.

**Resulting Actions for Violations.** If SWSC determines in its sole discretion that a Retailer has violated a provision of this MAP Policy and so notifies the Retailer, the MAP Policy will be strictly enforced and the following actions may be taken:

| Violation | Format | Resulting Action |
|---|---|---|
| 1st | Print (Non-Immediate Format) | Written Warnings |
| 1st | Social Media | Written Warnings & Immediate Removal or 30 Days Do Not Sell List |
| 1st | Online | Written Warnings & 1 Business Day Removal or 30 Days Do Not Sell List |
| 2nd | Print (Non-Immediate Format) | 30 Days Do Not Sell List |
| 2nd | Social Media | 180 Days Do Not Sell List (to be extended proportionately to the amount of time it takes for the removal) |
| 2nd | Online | 180 Days Do Not Sell (to be extended proportionate to the amount of time it takes for the removal) |
| 3rd | Print (Non-Immediate Format) | 365 Days Do Not Sell List |
| 3rd | Social Media | 365 Days Do Not Sell List (to be extended proportionate to the amount of time it takes for the removal) |
| 3rd | Online | 365 Days Do Not Sell (to be extended proportionate to the amount of time it takes for the removal) |

Any violations beyond the 3rd violation, regardless of format, can result in a lengthier or permanent placement on the Do Not Sell List, at SWSC's sole discretion. In addition to the actions outlined above, SWSC may, at any time, suspend or decline to make further sales to any Retailer who violates any terms of this MAP Policy, if by nature SWSC believes its relationship with Retailer is no longer in the best interest of SWSC or its brands.

**Figure 11.**

175. The policy also establishes an internal reporting structure to identify and punish violators. Sales personnel who encounter a suspected violation are required to "submit a written report identifying the offending Retailer," together with a copy of the advertisement, to S&W's MAP administrator.

176. In addition, S&W uses a Suggested Distributor Resale Price ("SDRP") program to constrain prices charged by distributors to firearm dealers.

177. AcuSport—formerly one of the largest firearm wholesalers—was an S&W distributor before it went bankrupt in 2018. During AcuSport's bankruptcy proceedings,[11] documents and testimony were filed that reveal information about S&W's SDRP program.

178. For example, according to emails published in that proceeding, in September 2017, AcuSport offered an additional two-percent marketing "co-op" (i.e. 2% payment for marketing from AcuSport to retailer) to selected retailers, which, in theory, a retailer could choose to pass on in whole or in part to customers in the form of a discount to get a competitive edge. After learning about the co-op, S&W's Sue Cupero, VP of sales, informed Mary Grim, VP of Supply Management and Operations at AcuSport, that "any offer of a rebate that we haven't approved" violates S&W's SDRP policy. Cupero said S&W would "suspend shipments" until AcuSport rescinded the co-op. AcuSport stated that it would exclude S&W products from the co-op program and notify its sales representatives and retailers. S&W then agreed to resume shipments.[12]

179. In an email chain from December 2017, S&W was forwarded an AcuSport offer from a competing distributor. The offer showed that AcuSport was offering a product below

---

[11] *In re ASPC Corp., f/k/a AcuSport Corp.*, 2:18-bk-52736 (S.D. Ohio) (hereafter, "*In re AcuSport*").

[12] *In re AcuSport*, Dkt. 384 at 62-63.

S&W's SDRP. S&W's Cupero characterized the offer as a "direct violation" of S&W's SDRP policy.

**From:** Cupero, Sue [mailto:SCupero@smith-wesson.com]
**Sent:** Wednesday, December 20, 2017 4:49 PM
**To:** Mary Grim
**Cc:** Mark Turon; Smith, Aaron
**Subject:** SDRP Violation

Mary,

This was just forwarded to me from another distributors. We suspended SDRP on a select group of M&P 1.0 pistols (list attached) The item in yellow is not on the list and it appears you are offering it to retailers below your cost. As I'm sure you are aware this is a direct violation of our SDRP policy.

Please review and let me know.

**Sue Cupero**
*Senior Director, Sales*
*Smith & Wesson*
*2100 Roosevelt Avenue*
*Springfield, MA 01104*
*Office – 413-747-3490*
*Cell – 413-896-0612*
scupero@smith-wesson.com

Here are some top items still in stock.

Smith
10175 - $388.00 - S&W M&P FS 40SW 4.25 GCT 15
10267 - $513.60 - S&W M&P 9MM 4.25 BL PRT NMS 17
109006 - $332.00 - S&W M&P 45ACP 4.5 BLK MG/MS 10
209920 - $428.80 - S&W M&P VTAC 40 4.25 DKRT 15
220071 - $440.80 - S&W M&P 40 4.25 BLK W/CTG 15

**Brent Kohler | AcuSport Corporation**
*Sales Professional*
417 Great Oak Drive | Waite Park , MN 56387-2507
Direct 800.543.3150 Ext. 5008 | Fax 320.252.6511
bkohler@AcuSport.com | www.AcuSport.com
Empowering Our Industry To Better Serve Consumers

Confidentiality Notice: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential or exempt from disclosure by law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you are strictly prohibited from printing, storing, disseminating, distributing or copying this message. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature, nor a waiver of any legal privilege, unless a specific statement to the contrary is included in this message. Thank you, AcuSport Corporation.

**Figure 12.**[13]

180. Finally, on October 25, 2018, Dena McPherson, then the Chief Accounting Officer at S&W's parent company, was deposed as a corporate representative. During her deposition, she testified that SDRP was a pricing structure that permitted distributors to sell at a specified level "but not below" without authorization, prevented "undercutting," and exposed a

[13] *In re AcuSport*, Dkt. 384 at 66-68.

noncompliant distributor to cancellation of its distributor agreement.[14] Although Ms. McPherson subsequently submitted an errata sheet "clarifying" this testimony, [15] notably, during the deposition, she verified her testimony after confirmatory questioning by the examining attorney:

> Q. So, just so I'm clear, AcuSport would have an obligation under the distributor agreement to sell at certain prices under the distributor agreement?
> A. Not below certain prices.

**Figure 13.[16]**

### c. FN

181. FN may have had an informal or sporadic MAP Policy in or around 2015, but FN did not further formalize or integrate its MAP Policy into its retailer programs until later in the Class Period. Public metadata for FN's MAP Policy webpage shows that FN published the page in August 2019. FN's 2019 Commercial Stocking Dealer program likewise required each participant to "acknowledge[] the FN America Map policy."

182. FN's publicly posted policy states that "[i]t is the FN unilateral policy that distributors, dealers, and retailers do not advertise in any public print or digital media a price for FN products that is less than the FN MAP price." The policy applies to every FN-authorized distributor and dealer and covers print publications, mailers, emails, text messages, banner ads, social media, retailer websites, among other forms of media.

183. FN treats advertisements suggesting an effective below-MAP price as violations, including instant rebates, percentage discounts, free products, gifts, package deals, credit card

---

[14] *In re AcuSport*, Dkt. 402 at 205-07.

[15] *In re AcuSport*, Dkt. 434-1 at 3.

[16] *In re AcuSport*, Dkt. 402 at 16:11-15.

discounts, and statements such as "sale price," "new low price," or "price too low to print." Except for FN-authorized promotions, the policy states that "[t]here are no exceptions" for "special competitive situations."

184. FN imposed the following penalties for violations of the policy:

**Course of Actions for Policy Violations**

If an advertisement does not comply with this MAP Policy, we may take the following actions:

-In the case of a first MAP violation by a FN-authorized reseller, FN may cease supplying to such reseller for a period of 30 to 90 days products for which the MAP violation occurred.

-In the case of a MAP violation by a reseller who purchases from an FN-authorized distributor, FN will cease supplying to such distributor for a period of 30 to 90 days products in which the MAP violation occurred.

-In the case of any additional MAP violation by an FN-authorized reseller, FN may terminate the reseller's authorization to sell the product or products in which the MAP violation occurred.

FN will unilaterally make all determinations in relation to a violation of the MAP Policy at its sole discretion. All accounts will be notified in writing of a violation.

**Figure 14.**

185. FN actively monitored and enforced its MAP policy during the Class Period. A January 2024 FN job posting required a district sales manager to "[m]onitor[] online dealer pricing to ensure Minimum Advertised Price (MAP) compliance." A September 2025 posting similarly required FN's Manager of Retail Chain and eCommerce to "[m]onitor online pricing and enforce[] MAP policies in coordination with legal and compliance teams."

**d. Beretta**

186. During the Class Period, Beretta had a MAP policy.

187. Beretta implemented its written MAP policy on June 6, 2018. The policy applied to every distributor, dealer, or retailer purchasing and reselling Beretta products in the United States.

188. Beretta's policy prohibits dealers from advertising "any [Beretta] product at a price below the then current minimum advertised price for the product in [Beretta]'s current published Dealer price list or on the Company's proprietary ecommerce site."

189. The policy also prohibited any advertisement that "expressly or by implication" communicated a price below MAP. Among other things, that prohibition included advertisements stating that a product was on sale, discounted, or promotion-eligible; coupons; and promotions offering a gift, gift card, or other item of more than nominal value. Beretta also prohibited unauthorized sales through third-party marketplaces, auction sites, internet forums, and discount websites.

190. Beretta imposed the following penalties for violations of the policy:

**Section 4: THE COMPANY'S RESPONSE TO MAP POLICY VIOLATIONS**

If the Company determines in its sole discretion that a Dealer has violated a provision of this MAP Policy and so notifies the Dealer, then in addition to a warning and reissuance of this MAP Policy to the Dealer, together with a request that the violation be remedied in a timely manner, the Company may immediately and without notice (1) fully suspend any marketing support or other sales package benefit for the current season or calendar year to which Dealer would have been entitled, and at the Company's discretion, and such support or benefit for the following season or calendar year; (2) refuse to accept orders from Dealer on Company products for a specified period of time; (3) require that Dealer forfeit any marketing, merchandising or other advertising benefit generally made available to Dealers. In addition to these responses, the Company may terminate any agreement with, or suspend or decline to make any further sales to, any Dealer who violates any terms of the MAP Policy, if by nature of the violations the Company believes its relationship with Dealer is no longer in the best interest of the Company or its brands, subject to such warnings and advance notice as the Company may provide, in its sole discretion, on a case by case basis.

**Figure 15.**

**e. Ruger**

191. While Ruger may not have had a formal MAP policy during the Class Period, Ruger did enforce pricing restraints on distributors that functioned similar to the other Manufacturer Defendants' MAP policies. Ruger also engaged in private discussions with other Defendants about instituting MAP or similar policies during periods when Ruger admitted that it was suffering commercial "pain" as a result of keeping its prices high while its competitors were discounting. Moreover, with increasing frequency and pitch around key time periods of the conspiracy, Ruger was a public proponent of price "discipline" in the Retail Firearms market and a vocal critic of discounting as a means of competing for customer sales, consistent with the goals of the conspiracy.

192. In its 10-K for 2006, Ruger disclosed that it had instituted a "minimum distributor resale price policy for its firearms," effective January 1, 2006, which "did not appear to have an adverse effect on the Company's firearm sales." From 2006 to 2013, Ruger's public statements reflect that it was a historic boom time in firearm sales with relatively low price competition and freedom to keep its prices rising.

193. By 2014, however, after the rise of internet-based firearms sales, an overall dip in demand, and a glut of unsold firearms began to put significant downward pressure on retail prices, Ruger's ability to maintain its MAP alone began to show serious signs of strain. In July 2014, then-CEO Michael Fifer acknowledged "the aggressive price discounting of many of our competitors" some of which were "staggering" in size. Ruger was feeling "panic" from retailers who called the company to tell them exactly to whom Ruger was losing sales: "I've got to take this deal from Competitor X or Competitor Y."[17] And it got worse. In October 2014, Fifer reported the aggressive discounting was continuing, including by "some of the big [brand] names." Fifer emphasized how "[m]aintaining absolute price discipline, both in the price charged to independent wholesalers and in unilaterally setting the minimum price they can in turn charge retailers is an important element of how the company goes to market."[18] But he also admitted that Ruger was losing market share as a result of this policy, particularly at the Black Friday sales events at large chain stores. Fifer summed it up at Ruger's May 2015 Annual Meeting: "[I]t was very painful to go through."[19]

---

[17] Ruger Q2 2014 Earnings Release Conference Call transcript.

[18] Ruger, Q3 2014 Earnings Call Transcript (Oct. 30, 2014).

[19] Ruger 2015 Annual Meeting transcript (May 5, 2015).

194. Four months later, during the September 2015 NASGW webinar, Sig Sauer—Ruger's number two competitor in pistols—said that it had recently spoken to "other manufacturers that aggressively enforced MAP and set a hard MAP policy" and decided to institute its own MAP policy. While Sig Sauer did not reveal the names of these manufacturers, Ruger was already on-record as describing itself almost precisely in those terms at precisely that time, while experiencing significant "pain" and loss of market share trying to withstand competition by non-MAP-enforcing manufacturers. In Ruger's very next earnings conference call, CEO Fifer breathed a sign of relief: "This year there has been less competitive price pressure."[20]

195. In late 2016 into 2017, price competition in the form of "aggressive discounting" once again caused problems for Ruger and its ability to maintain a strict minimum pricing policy. Notably, Ruger stated that this competitive pricing pressure primarily came from smaller, single-product-line competitors, but admitted that it was causing Ruger to have to respond with greater discounting to stay competitive. As for Ruger's biggest competitors, however, they were taking this moment to shore up the MAP ranks. As alleged above, in 2017, Ruger attended a private event called by BPS, alongside its direct manufacturer competitors, including the Manufacturer Defendants. Ruger also met privately thereafter with BPS in one or more follow-up meetings, demanding that Ruger adopt or enforce MAP or other minimum-pricing restrictions and help prevent other retailers from advertising or selling their products below the prices that BPS expected to charge. By mid-2018, Ruger was once again reporting that the momentary flare-up of discounting had dissipated.

[20] Ruger Q3 2015 Earnings Call Transcript (Nov. 5, 2015).

196. For the remainder of the Class Period, from time to time, Ruger publicly re-expressed its commitment to maintaining price discipline in firearms distribution and retail channels. The company also called out outbreaks of “pretty serious discounting” by smaller, limited-line manufacturers during periods of slow sales given that they are not as “strong” as full-line companies.[21] But Ruger no longer reported deep and widespread discounting of the type that it experienced in 2014 and 2017, or any notable discounting at all by major competitors. That problem, it appears, had been solved. During the Class Period, every Manufacturer Defendant had joined the conspiracy to institute or strengthen their MAP or MAP-like policies. As of today, Ruger has not announced any change in its MAP-like minimum distributor resale price policy.

**f. Glock**

197. Glock adopted a MAP policy no later than 2010 but, during the Class Period when discounting became rampant, it suffered competitively as a result of its adherence to MAP. Through its discussions with co-conspirators, Glock was able to reconfirm and strengthen its MAP commitment.

198. A publicly available version of Glock’s policy, effective November 1, 2010, applied to distributors, catalog and internet retailers, and every other dealer supplied by a Glock distributor. Although that copy predates the Class Period, upon information and belief, Glock maintained a materially similar written policy during the Class Period.

---

[21] Ruger Q3 2019 Earnings Call Transcript (Nov. 8. 2019) at 5-6; Q4 2022 Earnings Call Transcript (Feb. 23, 2023); Q1 2024 Earnings Call Transcript (May 8, 2024).

199. Under the policy, "[t]he advertising of GLOCK products by a [distributor or retailer] . . . at lower than suggested prices . . . . is prohibited and constitutes grounds for disciplinary action."

200. Glock's policy applied to all advertisements including flyers, posters, coupons, banner ads, email newsletters, store counter signs, and other media. The policy applied to "any end-price, end-of-transaction sales price," as well as prices displayed in shopping carts and checkout pages.

201. Glock imposed the following penalties for violations of the policy:

- Cease and desist all further sales to that offending Distributor/Dealer;
- Discontinue support of any sponsorship;
- Accelerate payment of any and all monies owed GLOCK by Distributor/Dealer under any then-applicable credit agreement notwithstanding any "current" account status; and
- Place violating Distributor/Dealer on a "Do Not Sell" list.

**Figure 16.**

202. Distributors were responsible for furnishing the policy to their dealers and ensuring that those dealers complied. All distributors and dealers were also required to "assist in the policing of this MAP Policy" by immediately identifying suspected violators to Glock.

203. During the September 2015 NASGW webinar, Sig Sauer—Glock's third-biggest competitor in pistols—said that it had recently spoken to "other manufacturers that aggressively enforced MAP and set a hard MAP policy" and decided to institute its own MAP policy. While Sig Sauer did not reveal the names of these manufacturers, at the time, that description squarely applied to Glock.

204. Glock did not publicly report significant difficulties maintaining a strong MAP policy prior to the Class Period, which covered a notable boom time in firearm sales across the market. Within the Class Period, however that changed. In 2017, just like Ruger, Glock reported

a severe downturn in sales, in part due to "extremely aggressive pricing and promotional practices by many competitors" that Glock did not join. Glock reported double-digit declines in handgun sales, revenues, and net income for 2017. At precisely this time, as alleged above, Glock attended a private event called by BPS, alongside its direct manufacturer competitors, including the Manufacturer Defendants. Glock also met privately thereafter with Defendants in one or more follow-up meetings for the purpose of getting one another's commitment to adopt or enforce MAP or other minimum-pricing restrictions, and to help prevent other retailers from advertising or selling their products below the prices that BPS/Cabela's expected to charge.

205. In November 2019, David Rich, owner of Naples Gun Shop & School in Florida, explained that Glock's enforcement of MAP was a principal reason he carried its firearms: "One of the main reasons I chose to become a stocking GLOCK dealer is their enforced MAP policy."[22]

### *7. Defendants Used Similar Methods to Detect Violations of Their Pricing Policies*

206. Effective enforcement of their restrictive pricing policies required Defendants to identify pricing deviations quickly and take action.

207. Defendants used similar and overlapping detection methods. Automated crawlers and third-party monitoring services searched retailer websites and online marketplaces; manufacturers maintained lists of authorized sellers, websites, usernames, and aliases; sales personnel, distributors, and retailers submitted suspected violations; and manufacturers traced products through the distribution chain to identify the wholesaler or dealer responsible. Together,

[22] Guns Down America, *Gun Industry Cohesion, Market Power, and Retail Pricing* 24 & n.50 (July 6, 2026) (quoting "Responses to 'Industry Leaders, Stand Up!' Pour In," *Shooting Industry* (Nov. 1, 2019)).

these practices created an enforcement loop in which a below-floor price could be detected, reported, investigated, and corrected through threatened or actual supply restrictions or suspensions.

208. The Manufacturer Defendants' policies illustrate this common structure. Sig Sauer employed technology to "crawl looking for MAP violations," required marketplace sellers to register their usernames and aliases, and tracked products sold by unauthorized resellers to identify their source. Sig Sauer also relied on dealers to identify competitors that violated MAP. S&W required its sales personnel to "submit a written report identifying the offending Retailer," accompanied by a copy of the offending advertisement. Glock required its distributors and dealers to "assist in the policing of this MAP Policy" by immediately identifying suspected violators. FN required registered dealers to disclose their company names and aliases and made resellers responsible for monitoring their own advertising. Beretta restricted sales to approved websites and centralized interpretation and enforcement of its policy within a designated brand-enforcement team.

209. BPS/Cabela's supplied an additional layer of surveillance. BPS/Cabela's monitored competing retailers' advertised prices and reported suspected MAP violations to the relevant manufacturer. When BPS/Cabela's identified a competitor advertising below MAP, on occasion it sent the manufacturer a screenshot of the competing retailer's listing. Those communications frequently came with no accompanying explanation: the screenshot communicated that BPS/Cabela's expected the manufacturer to investigate the competitor, require correction of the advertised price, and potentially impose a penalty. BPS/Cabela's thus helped police the pricing restraints from the retail level while the Manufacturer Defendants exercised control over the threatened punishment.

210. By 2024, the firearms industry also had access to a centralized platform for MAP violation detection and enforcement. Buying Freedom Group ("BFG") introduced its online platform, Atlas, at NASGW's annual Expo as a "direct-to-dealer MAP pricing engine." NASGW exclusively endorsed Atlas, and Sig Sauer adopted it as a founding customer to administer MAP across its retail and distribution networks.

211. BFG identified several "Key Features of Atlas":

Key Features of Atlas:

• Seamless MAP Management: Effortlessly upload MAP sheets through CSV or API integration, set and maintain pricing policies, and adjust for MAP holidays with a single click

• Eliminate Violations: Prevent MAP violations from slipping through unnoticed, and keep your products active in the marketplace with reduced downtime

• One Source of Truth: Transmit MAP and product data directly to retailers' preferred channels, ensuring consistency and accuracy across the board

• Retailer Compliance: Protect your brand while enhancing pricing accuracy and preserving the integrity of your pricing structure

• Strengthen Distributor and Retailer Relationships: Distributors and retailers have access to the correct data at the right time, fostering trust in your brand

The headaches of maintaining MAP pricing have long plagued manufacturers, especially since

most brick-and-mortar retailers are actively trying to comply but often fall victim to unreliable

data. Atlas addresses this by creating a reliable and centralized source of truth, allowing manufacturers to publish and maintain their MAP policies easily.

**Figure 17.** [23]

212. Around the time of launch, Ezra Weinstein, CEO of BFG, stated on a podcast that BFG would "enroll every manufacturer that maintains MAP pricing."[24]

---

[23] Press Release, "Introducing Atlas by BFG," *Outdoor Wire* (Oct. 15, 2024), *available at* https://theoutdoorwire.com/releases/79a5fb94-1fb7-4ca9-801b-5f246be3760c.

[24] Corecast (Oct. 12, 2024), *available at* https://www.youtube.com/watch?v=KE7Z6xLjyag.

213. In a November 2025 podcast demonstrating the Atlas platform, the hosts (BFG employees) said that the platform allows manufacturers "to set … MAP price and that goes directly to" dealers and "it actually forbids those dealers from being able to advertise under that MAP price." They stated that it also allows them to manage MAP rules and promotions (i.e., MAP holidays). Further, the hosts stated that manufacturers know they have "equity across [their] MAP pricing across thousands of stores when [they] put [their] MAP pricing into BFG because it's all automated," resulting in "no [MAP] violations." Additionally, **consumers encounter "the exact price the manufacturer is willing to allow out into the market,"** and the customer does not need to "go searching for the best price."[25]

### *8. Plus Factors in the Firearms Industry Provide Additional Evidence of a Conspiracy*

214. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion. Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."

215. Here, the parallel conduct described above—that the Manufacturer Defendants adopted, maintained, or strengthened analogous MAP and functionally equivalent minimum-price policies; restricted many of the same discounting methods, including coupons, bundles,

[25] Buying Freedom Podcast Episode 4, "Your MAP for the Holidays" (Nov. 7, 2025), https://www.youtube.com/watch?v=DYUqdGi_gEo.

shopping-cart pricing, and unauthorized promotions; and vigorously enforced their policies through similar monitoring methods and supply-related sanctions—did not occur in isolation. The Manufacturer Defendants' analogous minimum pricing policies and enforcement practices were accompanied by several plus factors supporting the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (1) the exchange of competitively sensitive information; (2) opportunities and invitations to collude; (3) a common motive to conspire; (4) methods to monitor and enforce compliance; (5) a market structure conducive to a cartel; and (6) conduct that is contrary to unilateral self-interest.

**a. Exchange of Competitively Sensitive Information**

216. The reciprocal sharing of firm-specific, competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.

217. The 2015 NASGW webinar—in which Sig Sauer openly revealed confidential market research and strategic advice given privately by its retailers, as well as insight into its own strategic pricing decision regarding MAP, to its direct competitors—is a prime example of this "super plus factor."

218. Throughout the Class Period, Defendants also shared competitively sensitive information through two platforms developed by NASGW: SCOPE and VAULT.

219. NASGW launched SCOPE at its annual Expo in October 2018. At launch, SCOPE included data supplied by 21 participating wholesalers and "represent[ed] over 51% of all new firearms sales." NASGW called SCOPE "the most comprehensive source of sales and inventory data in the industry" and attributed the platform's breadth to the collective participation of its wholesale members. Its reports included company performance, market share,

inventory share, inventory depletion, timing, and market trends, with sales and transaction information available by state, product category, and individual UPC. Around the time of launch, Luke Poston, a sales manager at Zander's Sporting Goods, described SCOPE as a "data sharing tool for manufacturers and distributors," that allows distributors a way to "pass along" information from one retailer to another.[26]

220. NASGW subsequently expanded SCOPE to add two complementary streams of information. SCOPE DLX collects shipment and inventory data directly from NASGW distributors. SCOPE CLX collects "actual sales at the register from dealers across the country" and aligns those transactions with distributor data.

221. Today, NASGW describes SCOPE as "the NASGW-powered platform delivering actionable insights across the shooting sports industry. By uniting data from distributors, retailers, and POS providers, SCOPE ensures businesses make smarter, faster decisions."

222. Defendant Ruger publicly encouraged broad participation in the information exchange. On January 8, 2026, NASGW hosted a webinar roundtable. The panelists were Todd Seyfert (Ruger), Mark Emonet (Lipsey's, firearms wholesaler), and Philip Milks (Orchid Advisors, FFL compliance consultant). The webinar was hosted by Kenyon Gleason, NASGW President, and moderated by Jon Rydberg of Orchid Advisors. During the call, the panelists spoke about SCOPE and VAULT.

223. Seyfert of Ruger explained that sharing retail-level sales information would inform distributors' inventory decisions and manufacturers' production decisions. Seyfert said:

> I think one point to that and what NASGW has been helping with some of the data collection is I think the more that we can work together, the manufacturer, the distributor, and the retailer to share what is actually selling at the retail level,

[26] Video, "NASGW's New SCOPE Program Can Help Your Business.," *available at* https://www.youtube.com/watch?v=qnSMMK-1_qU.

> helps inform the distributors in terms of their inventory that they need, which then helps inform the manufacturer in terms of what they need and when. . . . I would encourage as much participation in those programs that you have so that we all can get that information and be a little bit smarter about our planning.

224. Rydberg agreed with Seyfert:

> Yeah, I would agree. . . I could think back just oh boy 5, 10 years ago, there were very few sources of data largely focused on consumer studies, you know, interviews at the register and so forth or after the fact and NASGW's done a great job with SCOPE. The industry is still not there yet, but that data is definitely needed.

225. As shown in the graphic below, all parts of the firearm distribution chain use SCOPE:




**Figure 18.**[27]

226. In spring 2025, NASGW launched VAULT, "the centralized product data platform for the shooting sports industry."[28] At the time of launch, Kenyon Gleason, the president of NASGW, described VAULT as "a digital product information exchange exclusively

[27] "What is SCOPE," NASGW (last accessed November 23, 2026), *available at* https://nasgwscope.org/about.

[28] Kenyon Gleason, "President's Message: What's Old is New Again," NASGW (Mar. 14, 2025), *available at* https://nasgw.org/news/presidents-message-whats-old-is-new-again.

for the shooting sports community."[29] Like SCOPE, VAULT is used by all levels of the firearm distribution chain.

227. NASGW expressly connected VAULT to collective distribution of MAP information. During the January 2026 roundtable discussed above, the moderator asked what the industry was doing "collectively" to distribute MAP, MSRP, and product descriptions. NASGW President Kenyon Gleason responded that VAULT would contain "MAP pricing" and other information used "day-to-day" throughout the industry. Seyfert endorsed the project and committed Ruger to being a "huge supporter."

**b. Exchange of Competitively Sensitive Information is Contrary to Unilateral Self-Interest of Defendants**

228. Manufacturers have an independent economic incentive to protect competitively sensitive pricing information. A competing manufacturer that knows the minimum advertised prices for a rival's firearms can set lower prices for comparable products and capture market share. Yet, as alleged above, NASGW developed VAULT as a centralized platform for manufacturers to distribute their MAP pricing and other product information throughout the industry. By making MAP pricing available through a common platform used by distributors and retailers carrying competing brands, manufacturers risk exposing their pricing decisions to competitors who could use that information to undercut them. In the context of the alleged agreement, however, greater transparency into competing manufacturers' pricing restrictions could instead facilitate their collective adherence.

---

[29] *Id.*

### c. Opportunities to Collude

229. **Industry events.** In addition to the 2017 BPS supplier meeting and the informal inter-manufacturer communications described above, public sources identify several other settings in which senior personnel from competing firearm manufacturers, distributors, and retailers could communicate.

230. The annual Shooting, Hunting and Outdoor Trade Show ("SHOT Show") is "the largest . . . trade show for all professionals involved with the shooting sports, hunting and law enforcement industries. It is the world's premier exposition of combined firearms, ammunition, law enforcement, cutlery, outdoor apparel, optics and related products and services. The SHOT Show attracts buyers from all 50 states and more than 100 countries."[30] The SHOT Show is put on by NSSF.

231. The SHOT Show is closed to the general public, with attendance restricted to members of the shooting, hunting, military, and outdoor trade industry, including retailers, wholesalers, and distributors. NSSF also tightly controls media access: it admits only preapproved journalists who cover hunting, shooting, or firearms, and considers whether applicants' prior coverage demonstrates "objectivity, fairness and balance" toward the firearms industry. It does not permit any "general media" outlets to cover the show.[31] These restrictions create a controlled, industry-only environment in which competitors can meet outside the scrutiny of the general public.

---

[30] "SHOT SHOW," NSSF (last accessed November 23, 2026), *available at* https://www.nssf.org/shotshow.

[31] "General Media Information," SHOT SHOW (last accessed November 23, 2026), *available at* https://shotshow.org/general-media-information.

232. The SHOT Show has been an annual event for almost 50 years, and it has been held in Las Vegas continuously since 2010. In 2025, more than 54,000 industry professionals attended the SHOT Show.

233. Based on publicly available sources, the Manufacturer Defendants attended and/or had exhibits at the SHOT Show during the Class Period.

234. The following employees of the Manufacturer Defendants have been identified as having attended SHOT Shows during the Class Period—a non-exclusive list, given that SHOT Show does not publicly reveal its attendees:

| Year | Manufacturer | Identified attendees (titles) |
|---|---|---|
| 2015 | FN | Mark Hanish (Senior Director of Commercial Sales) |
| 2016 | Sig Sauer | John Brasseur (Director of Product Management) |
| 2016 | S&W | Jan Mladek (Director of Marketing) |
| 2017 | Sig Sauer | Ron Cohen (CEO) |
| 2017 | S&W | Jan Mladek (Director of Marketing) |
| 2018 | Sig Sauer | Phil Strader (Pistol Product Manager); Joe Huston (General Manager, Air Gun Division) |
| 2018 | Ruger | Mark Gurney (Director of Product Management) |
| 2019 | Sig Sauer | Tom Taylor (Chief Marketing Officer) |
| 2019 | Ruger | Brandon Trevino (Pistol Product Manager) |
| 2019 | Glock | Corey Jones (Assistant National Sales Director) |
| 2023 | FN | Christopher Johnson (Senior Product Manager); Benjamin Voss (Senior Product Manager); John Ryan (Product Management) |
| 2023 | Beretta | Graham Kohlmeyer (Director of Product Development); Curt Plaskett (Southeast Sales Representative) |
| 2025 | Ruger | Chris Killoy (CEO) |
| 2025 | Beretta | Jeff Reh (General Counsel) |
| 2026 | S&W | Dave O'Connor (Media-Partnership Relations Manager) |
| 2026 | Ruger | Tom Finch (Product Manager) |
| 2026 | Glock | Scotty Banks (Training Manager) |
| 2026 | FN | Christopher Johnson (Pistol Product Manager) |

**Figure 19.**

235. In addition to the SHOT Show itself, NSSF puts on a number of companion events during the week of the show (referred to as SHOT Week), including the NSSF/Honored

American Veterans Afield (HAVA) Golf Classic. These events provide additional opportunities for competitor-to-competitor interactions.

236. The opportunities for competitor contact created by the SHOT Show and other industry events extend well beyond their formal programming. After spending the day attending meetings and presentations, executives from competing firearm manufacturers, distributors, and retailers frequently reconvene for dinners, late-night drinks, and other social gatherings. Business discussions often continue in these informal settings, creating additional opportunities for competitors to communicate outside formal meetings.

237. These informal interactions are reinforced by the firearms industry's close-knit social culture. Senior executives of competing manufacturers often share a personal enthusiasm for firearms, hunting, and shooting sports; these shared interests, coupled with frequent interaction at industry events, facilitate the development of longstanding friendships that extend beyond their business relationships. Industry executives socialized through hunting trips, recreational outings, and other gatherings outside organized industry events. As a result, personal and professional relationships are deeply intertwined, providing recurring opportunities for competitors to communicate informally about matters of mutual commercial interest. In fact, it is widely understood that *not* engaging in these types of social interactions tends to mark manufacturer employees as unfriendly or an outsider, which can adversely affect the employee's advancement and career opportunities, even to a larger degree than in other close-knit industries.

238. **Movement of senior executives.** Movement of senior executives among competing firearm manufacturers is commonplace. For example, Christopher Killoy served as S&W's vice president of sales and marketing (2001-2003) before later becoming Ruger's president and CEO (2017). Tom Taylor previously served as S&W's vice president of marketing

(2004-2009) before joining Sig Sauer in 2015, where he became chief marketing officer and executive vice president of commercial sales. Jay Pitassi held senior sales positions at Beretta (1998-2013) and subsequently served as FN America's director of sales (2025). Mark Hanish served as FN America's senior director of commercial sales (2013-2016) before later joining Sig Sauer as vice president of ammunition and suppressors (2023). These examples are representative, not exhaustive.

239. This movement also extends to the industry's trade associations. Stephen Sanetti, formerly Ruger's president and chief operating officer, left Ruger in 2008 to become NSSF's president and CEO, remaining its CEO through 2019. Chris Dolnack previously worked at S&W before becoming NSSF's senior vice president and chief marketing officer, where he oversaw the SHOT Show during the Class Period. These career moves reflect the close professional ties among competing firearm manufacturers and NSSF.

**d. Defendants Have a Common Motive to Conspire**

240. Each of the Manufacturer Defendants as well as BPS/Cabela's has a common motive to fix retail prices and thereby increase margins on sales of their products. This is not simply a recognition that, all other things being equal, commercial businesses would rather make more money than less. In a market running under normal, competitive conditions, any one retailer or manufacturer that independently acts to raise its prices significantly above its competitors will lose customers to lower-priced alternatives. Thus each Defendant did not simply have the motive to raise prices, it had a *common motive to conspire to reach that result*—meaning, to engage in price-fixing of Retail Firearms in common with horizontal competitors (or, in the case of BPS/Cabela's, to help orchestrate such collusion among horizontal competitors).

241. In addition, as alleged above, the Manufacturer Defendants collectively financed messaging that stimulated demand for firearms generally, rather than any particular manufacturer's products. This created a shared financial incentive to prevent price competition from eroding the returns on that marketing investment—which could happen, for example, if a Manufacturer Defendant attempted to capitalize on the greater demand generated by the group's marketing efforts by steering new customers to its products with discounting. The MAP, MTP, SDRP, and related minimum-price restraints alleged above provided a means of doing so, completing the feedback loop between group marketing and group pricing restraints. By limiting discounting at the retail and distributor levels, these restraints reduced pressure on manufacturers to lower their own prices or offer concessions. The Manufacturer Defendants thus shared a motive to coordinate pricing that went beyond the ordinary desire to increase profits: preserving the returns on their collective investment in generating industry-wide demand.

**e. Monitoring and Enforcing Compliance**

242. **Monitoring MAP compliance.** As alleged above, Defendants established overlapping mechanisms to monitor and enforce compliance with their pricing restrictions. The Manufacturer Defendants used automated monitoring tools and reports from sales personnel, distributors, and retailers to detect pricing violations and identify the responsible sellers. BPS/Cabela's also monitored competitors' advertised prices and reported suspected violations to manufacturers, often by forwarding screenshots of offending advertisements. Manufacturers responded to violations by demanding corrective action and threatening or imposing supply restrictions. NASGW also endorsed a centralized MAP enforcement platform adopted by at least Manufacturer Defendant Sig Sauer. These practices demonstrate Defendants' ability to identify

departures from their pricing restrictions and impose commercial consequences on those who failed to comply.

243. **Shelf space.** Retailers also reinforced MAP compliance through decisions about which manufacturers' products to stock, display, and promote. As alleged above, BPS/Cabela's used its control over shelf space to enforce its pricing demands, with noncompliant manufacturers risking the loss of valuable shelf positions and promotional opportunities. By favoring manufacturers that adopted and enforced MAP policies, retailers created an additional incentive for manufacturers to comply with the alleged pricing agreement.

244. The firearms industry has also demonstrated a robust ability to enforce collective commitments outside the pricing context. At least as early as 2000, the most powerful forces in the firearms industry—namely, the NRA, NSSF, and the largest manufacturers—learned that political or social pressure might cause a manufacturer or retailer to capitulate to voluntarily agree to certain firearm restrictions, which risked undermining the industry's overarching message that firearm sales should be free and unburdened. The industry learned that it could band together to punish, via commercial retaliation, any such capitulation and thereby deter future defections. Thus, the Retail Firearms industry is one with a unique, demonstrated history of group cohesion on multiple fronts: pricing, marketing and messaging, and commercial strategy.

***i. S&W boycott.***

245. In March 2000, in the wake of the Columbine school shooting and intense pressure from citizens and lawmakers to do more to restrict access to guns of the type used by the shooters, S&W broke ranks with the rest of the firearms industry by entering into an agreement with the Clinton administration and several state and local governments to resolve

pending and threatened litigation. Under the agreement, S&W committed to adopting additional firearm-safety features and imposing new restrictions on its distributors and retailers, including requirements concerning background checks at gun shows. S&W was the only major firearm manufacturer to enter into such an agreement.

246. NSSF immediately condemned S&W's decision. Its president, Robert Delfay, declared that S&W had "violated a trust" with the firearms industry and had "run off and cut their own deal," which "fracture[d] the [industry's] unity" against both the lawsuits and firearm restrictions generally.[32] The NRA was also critical of the deal. Three days after it was announced, in a statement titled *The Smith & Wesson Sellout*, the NRA characterized the Clinton administration's policies as a "war on American gun owners," accused S&W of having "run up the white flag of surrender," and warned that the agreement would impose standards intended to "ultimately eliminate sales" to private citizens.[33] The NRA thus treated S&W's independent agreement with the Clinton Administration not merely as a disagreement over gun regulation, but as a betrayal of the industry's united front.

247. S&W faced retaliation from across the industry for the settlement. Gun Owners of America publicly called for a boycott of S&W products, while dealers faced pressure to stop carrying its firearms. The backlash also extended to other commercial relationships: advertisers threatened to withdraw from gun magazines that continued accepting S&W advertisements, and shooting-competition sponsors threatened to withdraw from events sponsored by S&W. The Connecticut and Maryland Attorneys General even launched an antitrust investigation of other

---

[32] Sharon Walsh, *Gun Industry Views Pact as Threat to Its Unity*, Wash. Post (Mar. 18, 2000), https://www.washingtonpost.com/archive/politics/2000/03/18/gun-industry-views-pact-as-threat-to-its-unity/b18b920f-afdf-44d1-a252-68b12863a032.

[33] Nat'l Rifle Ass'n Inst. for Legis. Action, *The Smith & Wesson Sellout* (Mar. 20, 2000), https://www.nraila.org/articles/20000320/the-smith-wesson-sellout.

firearms-industry companies based on a potential concerted refusal to deal in violation of the Sherman Act. They alleged that major gun manufacturers had turned on S&W and worked together to convince retailers not to stock or sell S&W guns, to send a message that S&W was wrong to break ranks. Defendant Ruger confirmed it was a target of these investigations in a financial statement.[34]

248. The industry's concerted retaliation against S&W served as a powerful warning to other manufacturers. Just one day after it was publicly reported that Defendant Glock was considering a similar agreement, Glock rejected the proposal, despite facing more than $15 million in potential litigation costs.

249. The boycott cost S&W dealer relationships and drove longtime customers to competing manufacturers: in its 2002 annual report, more than a year after its settlement and the ensuing boycott, S&W acknowledged those losses and explained that it was still working to regain the business. S&W's CEO resigned in September 2000, approximately six months after the agreement. In May 2001, British parent Tomkins sold S&W to Saf-T-Hammer for a massive loss: having purchased S&W for $112 million in 1987, it sold S&W for a paltry $15 million equity purchase price.

250. Shortly after the acquisition, S&W's new owners traveled to NRA headquarters in Fairfax, Virginia, to attempt to repair the company's relationship with the organization. The effort succeeded, and S&W was welcomed back into the industry's fold.

251. The S&W boycott also reinforced the NRA's influence over manufacturers' independent business decisions. In the years that followed, manufacturers routinely consulted the NRA regarding new products, marketing strategies, public statements, and legislative positions.

---

[34] Ruger, 10-K (2003).

This deference became an established industry norm that continues to influence manufacturers' decisions today. Manufacturers often give NRA publications the first opportunity to announce their new products, devote substantial advertising budgets to the organization, and consult NRA officials before speaking with legislators. Together, these practices demonstrate the industry's historic ability to monitor adherence to its shared positions and enforce compliance through the threat of commercial retaliation.

### *ii. Retaliation against Dick's Sporting Goods.*

252. The industry had clearly learned its lesson from the S&W defection and near destruction; it would be a long time before any manufacturer or retailer dared to contradict the NRA, NSSF, or its key members. But it did happen, in the Class Period, and the firearms industry again banded together to enforce conformity.

253. Following the February 2018 school shooting in Parkland, Florida, Dick's Sporting Goods announced that it would stop selling certain semiautomatic rifles, raise the minimum age for firearm purchases to 21, and advocate for stricter firearm laws. According to Dick's CEO, Ed Stack, this was a measured and reasonable business decision that the company felt was important to take in the wake of the tragedy. As Stack said in a letter, "We [Dick's] support and respect the Second Amendment, and we recognize and appreciate that the vast majority of gun owners in this country are responsible, law-abiding citizens. But we have to help solve the problem that's in front of us."[35] In April 2018, Dick's hired a lobbying firm to advance those legislative efforts.

254. The reaction from the leaders of the firearms industry was swift and angry. On May 4, 2018, NSSF's Board of Governors unanimously voted to expel Dick's from the

[35] "A Letter From Dick's Sporting Goods CEO Ed Stack," *CBS News* (Feb. 28, 2018).

organization, citing conduct "detrimental to the best interests of the Foundation" and specifically identifying Dick's decision to lobby for additional firearm restrictions.[36] The retaliation extended beyond NSSF: firearm manufacturers Springfield Armory and Mossberg separately announced that they would terminate their commercial relationships with Dick's because of the retailer's political advocacy.

255. Notably, five of the six Manufacturer Defendants were represented on NSSF's Board of Governors when it unanimously expelled Dick's. Robert L. Scott, then vice chairman of S&W's parent company, served as NSSF's chairman; Jeffrey Reh, Beretta's general counsel, served as co-vice chairman; and Joshua W. Dorsey IV, a Glock executive, served as secretary. Ruger's president and CEO, Christopher J. Killoy, and Sig Sauer's chief marketing officer and executive vice president of commercial sales, Tom Taylor, also served on the board. The votes to expel Dick's were *their* votes.

256. The S&W boycott and retaliation against Dick's demonstrate the firearms industry's longstanding ability to enforce collective commitments through commercial pressure, even against major manufacturers and retailers. This was not merely a historical practice: NSSF's expulsion of Dick's occurred during the Class Period and was approved by a board that included representatives of five Manufacturer Defendants.

257. Together, these allegations demonstrate the industry's ability to identify and punish departures from collective commitments, supporting the inference that Defendants could sustain and enforce their alleged pricing agreement.

---

[36] *NSSF's Board Votes to Expel Dick's Sporting Goods*, SGB Media (May 7, 2018), https://sgbonline.com/nssfs-board-votes-to-expel-dicks-sporting-goods.

#### f. Market Structure

258. **Industry concentration.** The firearms manufacturing industry is dominated by a relatively small number of firms. As alleged above, the six Manufacturer Defendants collectively account for roughly two-thirds of domestic pistol production, with Sig Sauer, S&W, Ruger, and Glock ranking as the four largest domestic pistol manufacturers. Concentration extends across other firearm categories as well: analysis of ATF production data shows that the eight largest manufacturers in each of the four major firearm categories—pistols, revolvers, rifles, and shotguns—account for nearly three-quarters of domestic production in their respective categories. This concentration facilitates coordination by limiting the number of major competitors and making departures from common pricing practices easier to detect.

259. **Barriers to expansion.** The firearms manufacturing industry has high barriers to expansion. Although smaller manufacturers operate in the firearms industry, substantial barriers prevent them from rapidly expanding to compete with the industry's dominant firms. Manufacturing firearms at a commercial scale requires significant investments in specialized machinery, facilities, skilled labor, and reliable supplies of raw materials and components. It also requires substantial technical expertise, relationships with distributors and retailers, and sufficient production volume to achieve economies of scale. These requirements make it difficult for smaller manufacturers to rapidly expand production and distribution in response to higher prices, limiting their ability to constrain the pricing practices of the industry's dominant manufacturers.

260. **Elasticity of demand.** Consumer demand for firearms is relatively insensitive to price increases. A 2023 economic study by Sarah Moshary, Bradley Shapiro & Sara Drango analyzed consumers' firearm purchasing preferences and found that firearm demand is relatively price-inelastic, particularly among existing gun owners. The study estimated that a 10% increase

in firearm prices would reduce the likelihood of purchasing a firearm by only 1.25 percentage points. These findings demonstrate that many consumers will continue purchasing firearms even when prices increase substantially, making the industry particularly susceptible to coordinated efforts to maintain elevated prices.

261. Further, the firearms industry has intentionally cultivated this price-insensitive demand by transforming gun ownership into an expression of cultural identity, as described above.

262. **Fungible products.** Firearms are often close substitutes within categories defined by their intended use. For example, consumers seeking a handgun for personal protection, a rifle for deer hunting, or a shotgun for bird hunting can choose among numerous firearms offered by competing manufacturers that serve substantially the same purpose. Although firearms differ in brand, design, and features, consumers view competing manufacturers' products as interchangeable for these purposes.

263. These similarities are evident in specific models. Glock's 17, S&W's M&P 2.0, and Sig Sauer's P320 are all full-sized striker-fired, polymer-frame guns with barrel lengths varying between four and five inches and with a standard capacity of 17 rounds of 9mm, and all come standard with an internal safety system tied to the trigger. A firearms blog commented on the similarities of these three guns: "Objectively, there is little meaningful difference in the overall dimensions and weight of these three guns, and all three have similar barrel lengths. They are all striker-fired polymer guns with internal safeties."[37] Any differences between the three were minor.

[37] Joel Nadler, "What are the Differences Between Glock, S&W, and Sig Polymer Handguns?," *GunMag Warehouse* (Nov. 8, 2023; updated October 2, 2024), *available at*

264. Other examples of similar products include Ruger's American Rifle Generation II and Savage's Axis 2 Pro, which are both bolt-action hunting rifles offered in .308 Winchester, and Beretta's A300 Ultima and Browning's Silver Field, which are both gas-operated semiautomatic field shotguns offered in 12 gauge.

265. These examples are illustrative and show that consumers can substitute similar firearms from different manufacturers within broader categories of functionality.

### E. Defendants' Conspiracy Resulted in Artificially Inflated Prices for Retail Firearms

266. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among Defendants has been restrained or eliminated with respect to prices for Retail Firearms;

b. The price of Retail Firearms has been fixed, stabilized, inflated, or maintained at artificially high levels; and

c. Individuals have been deprived of free and open competition.

267. Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for Retail Firearms than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid on Retail Firearms. This is an injury of the type that the antitrust laws were meant to punish and prevent.

268. During the same period in which the Manufacturer Defendants adopted, maintained, or strengthened the parallel minimum-price restraints alleged above, pricing data

---

https://gunmagwarehouse.com/blog/what-are-the-differences-between-glock-sw-and-sig-polymer-handguns.

from the Federal Reserve Bank of St. Louis shows that prices for Retail Firearms have substantially increased during the Class Period and remain elevated today.




**Figure 20.**

269. Defendants' price fixing agreement is *per se* unlawful. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined.

## V. STATUTE OF LIMITATIONS

270. Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting the claims for relief. Plaintiff and Class members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this action.

271. Throughout the Class Period, Defendants took affirmative steps to conceal their anticompetitive agreement. Defendants publicly presented the Manufacturer Defendants' pricing

policies as independent and unilateral business decisions. For example, FN expressly described its restraint as "the FN unilateral policy," while Ruger publicly stated that it was "unilaterally setting" the minimum prices its distributors could charge retailers. These representations created the appearance that each manufacturer was acting independently and concealed Defendants' agreement to coordinate the implementation and enforcement of their pricing restrictions.

272. Defendants reinforced that misleading appearance by conducting their coordination outside public view. BPS communicated its minimum pricing requirements to each Manufacturer Defendant through separate manufacturer-specific meetings and calls. Representatives of competing manufacturers then exchanged assurances in nonpublic, industry-only settings. Defendants did not disclose these communications, the assurances exchanged among competitors, or the fact that BPS was seeking comparable commitments from competing manufacturers.

273. The public existence of MAP and other pricing policies did not reveal the conspiracy. To consumers, those policies appeared to be separate, manufacturer-specific restrictions. Plaintiff and members of the Class had no access to Defendants' internal communications, BPS's manufacturer-specific discussions, the informal communications among competing manufacturers, or the monitoring and enforcement records showing how the arrangement operated. The existence of similar publicly announced policies, standing alone, would not have placed a reasonable consumer on notice that the policies were being maintained and enforced pursuant to a horizontal agreement.

274. Plaintiff first learned of facts suggesting that the Manufacturer Defendants' pricing policies were coordinated only shortly before filing this action. Before that, no publicly

available information provided Plaintiff with a reasonable basis to allege the conspiracy described herein.

275. Accordingly, because Defendants affirmatively concealed their agreement and Plaintiff and members of the Class could not have discovered it through reasonable diligence, all applicable statutes of limitations were tolled until Plaintiff discovered, or reasonably could have discovered, the operative facts underlying the claims.

276. In the alternative, this complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Plaintiff and members of the Class are entitled to recover damages they suffered during the limitations period.

277. A cause of action accrued for Plaintiff and members of the Class each time Plaintiff or members of the Class purchased Retail Firearms sold at a price artificially inflated by Defendants' price fixing conspiracy.

## VI. CLASS ALLEGATIONS

278. Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities in the United States and its territories, from January 1, 2015 through the present (the "Class Period"), who purchased at the retail level, not for resale, Retail Firearms produced by a Manufacturer Defendant.

279. The following persons and entities are excluded from the above-described proposed Class:

a. Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

b. All governmental entities;

c. All Counsel of Record; and

d. The Court, Court personnel, and any member of their immediate families.

280. The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiff believes that due to the nature of the industry there are likely millions of Class members in the United States and its territories.

281. Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a. Whether Defendants joined a conspiracy to fix the prices of Retail Firearms;

b. The duration of the anticompetitive schemes alleged herein and the acts performed by Defendants in furtherance of those schemes;

c. Whether such schemes violated the federal antitrust laws;

d. Whether such schemes violated state antitrust or common laws;

e. Whether the conduct of Defendants, as alleged in this complaint, caused injury to Plaintiff and other members of the Class;

f. Whether Defendants caused Plaintiff and members of the Class to suffer damages in the form of overcharges on Retail Firearms;

g. Whether Defendants fraudulently concealed the conspiracy;

h. The appropriate class-wide measure of damages; and

i. The nature of appropriate injunctive relief to restore competition in the Retail Firearms industry.

282. Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' conspiracy in that they paid artificially inflated prices for Retail Firearms.

283. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

284. Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

285. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

286. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

287. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII. CAUSES OF ACTION

### COUNT 1
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

288. Plaintiff repeats the allegations set forth in paragraphs 1-287, as if fully set forth herein.

289. During the Class Period, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

290. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Retail Firearms.

291. Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Retail Firearms.

292. This conduct is unlawful under the *per se* standard.

293. Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

### COUNT 2
### Violation of State Antitrust and Consumer Protection Laws

294. Plaintiff repeats the allegations set forth in paragraphs 1-287, as if fully set forth herein.

295. During the Class Period, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of the following state antitrust or consumer protection laws:

a. Arizona Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Retail Firearms in Arizona.

b. Ark. Code Ann. § 4-88-101, *et seq.*, with respect to purchases of Retail Firearms in Arkansas.

c. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and California common law, with respect to purchases of Retail Firearms in California.

d. Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq.*, with respect to purchases of Retail Firearms in Colorado.

e. Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to purchases of Retail Firearms in Connecticut.

f. Del. Code Ann. tit. 6, § 2101, *et seq.*, with respect to purchases of Retail Firearms in Delaware.

g. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of Retail Firearms in the District of Columbia.

h. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Retail Firearms in Florida.

i. Hawaii Code §§ 480, *et seq.*, with respect to purchases of Retail Firearms in Hawaii.

j. 740 Ill. Comp. Stat. 10/1, *et seq.*, with respect to purchases of Retail Firearms in Illinois.

k. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of Retail Firearms in Iowa.

l. Kan. Stat. Ann., §§ 50-101, *et seq.*, with respect to purchases of Retail Firearms in Kansas.

m. Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of Retail Firearms in Massachusetts.

n. Me. Rev. Stat. Ann. 10, §§ 1101, et seq, with respect to purchases of Retail Firearms in Maine.

o. Md. Code, Com. Law §§ 11-204, *et seq.*, with respect to purchases of Retail Firearms in Maryland.

p. Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Retail Firearms in Michigan.

q. Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Retail Firearms in Minnesota.

r. Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Retail Firearms in Mississippi.

s. Mo. Rev. Stat. §§ 407.010, et. seq., with respect to purchases of Retail Firearms in Missouri.

t. Mont. Code, §§ 30-14-201, *et seq.* with respect to purchases of Retail Firearms in Montana.

u. Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Retail Firearms in Nebraska.

v. Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of Retail Firearms in Nevada.

w. N.H. Rev. Stat. Ann. §§ 356.1, *et seq.*, with respect to purchases of Retail Firearms in New Hampshire.

x. N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Retail Firearms in New Mexico.

y. N.Y. Gen. Bus. Laws § 340, *et seq.*, with respect to purchases of Retail Firearms in New York.

z. N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Retail Firearms in North Carolina.

aa. N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Retail Firearms in North Dakota.

bb. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Retail Firearms in Oregon.

cc. R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Retail Firearms in Rhode Island.

dd. S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of Retail Firearms in South Dakota.

ee. Tenn. Code Ann. §§ 47-25-102, *et seq.*, with respect to purchases of Retail Firearms in Tennessee.

ff. Va. Code Ann. §§ 59.1-196 *et seq.*, with respect to purchases of Retail Firearms in Virginia.

gg. Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases of Retail Firearms in Vermont.

hh. W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Retail Firearms in West Virginia.

ii. Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Retail Firearms in Wisconsin.

jj. Wyo. Stat. Ann. §§ 40-4-101, *et seq.*, with respect to purchases of Retail Firearms in Wyoming.

296. Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Retail Firearms.

297. This conduct is unlawful under the *per se* standard.

298. Plaintiff and members of the Class are entitled to damages and/or multiple damages (as permitted by law), attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3
## Unjust Enrichment

299. Plaintiff repeats the allegations set forth in paragraphs 1-287, as if fully set forth herein.

300. Plaintiff and Class members paid higher prices for Retail Firearms than what would have otherwise occurred in a market free of Defendants' unlawful conduct.

301. Plaintiff and Class members conferred a benefit upon Defendants with their money. Specifically, they paid Defendants for Retail Firearms.

302. Defendants knew that Plaintiff and Class members conferred a benefit that Defendants accepted. Defendants profited heavily from these transactions.

303. Under principles of equity and good conscience, Defendants should not be permitted to retain the money made through these unconscionable acts.

304. Plaintiff and Class members have no adequate remedy at law.

305. Defendants should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiff and Class members. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class members overpaid for Retail Firearms produced or sold by Defendants.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully asks this Court for the following:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as a Class Representative and his counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that Defendants' agreement, contract, combination, or conspiracy, and the acts undertaken in furtherance thereof, constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court grant Plaintiff and members of the Class all other equitable relief in the nature of divestiture, disgorgement, restitution, and/or the creation of a constructive trust to remedy Defendants' violations of law;

E. The Court enter judgment against Defendants and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

F. The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: November 23, 2026

Respectfully submitted,

<u>/s/ *Zachary R. Kuster*</u>
Zachary R. Kuster, #281046
William E. Christie, #11255
Shaheen & Gordon, P.A.
107 Storrs Street/P.O. Box 2703
Concord, NH 03302
(603) 225-7262
zkuster@shaheengordon.com
wchristie@shaheengordon.com

Gregory S. Asciolla* (NY Bar Number: 2635241)
Alexander E. Barnett* (NY Bar Number: 2522696)
Carrie A. Syme* (NY Bar Number: 3957594)
Jonathan S. Crevier* (CO Bar Number: 62506)
Corey E. Lipton* (NY Bar Number: 6319552)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
csyme@dicellolevitt.com
jcrevier@dicellolevitt.com
clipton@dicellolevitt.com

Eric J. Artrip* (AL Bar Number: ASB9673I68E)
**MASTANDO & ARTRIP, LLC**
301 Holmes Ave NE, Suite 100
Huntsville, Alabama 35801
(256) 532-2222
(256) 513-7489
artrip@mastandoartrip.com

* Application for *pro hac vice* admission forthcoming

*Attorneys for Plaintiff and the Proposed Class*